### COLGATE v. JAMES T. WHITE & CO.

(Circuit Court, S. D. New York. August 3, 1910.)

1. **INJUNCTION (§ 128*)—PUBLICATION OF BIOGRAPHY—EVIDENCE—WEIGHT.**

    Evidence on a bill to enjoin publication of complainant's biography *held* to show that he gave facts concerning his life on an understanding that they would be used in a set of books officially recognized by the federal government.

    [Ed. Note.—For other cases, see Injunction, Cent. Dig. § 278; Dec. Dig. § 128.*]

2. **INJUNCTION (§ 59*)—PUBLICATION OF BIOGRAPHY.**

    Injunction lies to prevent publication of complainant's biography in a set of books other than a set issued under auspices of the federal government, where he gave the facts for use in such set only.

    [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 114-116; Dec. Dig. § 59.*]

3. **CONTRACTS (§ 168*)—TERMS IMPLIED—PUBLICATION OF BIOGRAPHY.**

    Complainant having indicated that he would give facts concerning his life for use only in a biography issued under auspices of the federal government, there was an implied promise that they would not be otherwise used.

    [Ed. Note.—For other cases, see Contracts, Cent. Dig. § 751; Dec. Dig. § 168.*]

4. **EQUITY (§ 141*)—BILL IN EQUITY—REQUISITES.**

    While a bill in equity must advise defendant of the facts on which complainant relies, it need not state a cause of action at law, a bill which asks relief not itself inconsistent, and justified by the narrative part of the bill, being ordinarily sufficient; and complainant is not limited to any given theory of law if he does not depart from the bill itself.

    [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 323-333; Dec. Dig. § 141.*]

5. **COURTS (§ 329*) — FEDERAL COURTS — JURISDICTION — VALUE OF SUBJECT-MATTER.**

    On a bill to enjoin publication of complainant's biography in a set of books, an allegation that the right infringed is worth $2,000 is prima facie sufficient to confer jurisdiction of the subject-matter on the federal

circuit court, in the absence of proof that the facts which he gave for publication in another set of books were merely formal, or such as any one might learn.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 897; Dec. Dig. § 329.*

Jurisdiction of circuit courts as determined by the amount in controversy, see notes to Auer v. Lombard, 19 C. C. A. 75; Tennent-Stribling Shoe Co. v. Roper, 36 C. C. A. 459.]

6. COURTS (§ 328*)—FEDERAL COURTS—AMOUNT IN CONTROVERSY—JOINDER OF CLAIMS NOT RELATED.

On enjoining publication of complainant's biography in a set of books other than that for which he gave facts of his life, relief cannot be had in the United States Circuit Court against a contract to subscribe for a set at $10 a volume; the subject-matter concerning the biography and the subscription being distinct.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 891; Dec. Dig. § 328.*]

In Equity. Bill by R. R. Colgate against James T. White & Co. Decree for complainant.

See, also, 169 Fed. 887.

This is a bill in equity to prevent the defendant from publishing in the National Cyclopedia of American Biography facts of complainant's life obtained from him, and to deliver up and cancel a certain written instrument of subscription to the said Cyclopedia obtained from the complainant by fraudulent misrepresentations. The bill depends upon diversity of citizenship, and charges that the defendant represented to the complainant that the biography in which he proposes to insert the facts stated was one to which the Congress of the United States had made an appropriation of money, and that the defendant was engaged in collecting the information and in publishing such books for the government; that, upon these representations, the complainant told the defendant a number of facts, including the principal events of his life, and subscribed for a set of the said books at $10 a volume; that the representations were false and known by the defendant to be false, and were made with intent to deceive and mislead the complainant; that the complainant is a private person, and not engaged in business nor a holder of public office, and that he acted upon the representations of the defendant that the publication was a government work; that the defendant threatens to use the facts so obtained and to collect for the subscription. The answer denies the substantial allegations of the bill, and alleges affirmatively that the complainant ratified the contract after knowledge of the facts.

Upon the final hearing certain affidavits were submitted as final proofs, which had been used upon a hearing for preliminary injunction. The complainant's affidavit alleges that he is a retired business man having an office in New York and living in Sharon, Conn.; that on December 2, 1908, he had a conversation with one Gower, a sales-agent of the defendant, who told him he had been assigned to write his biography for the "National Cyclopedia of American Biography." The defendant protested, whereupon Gower said that it was a national affair. Complainant then said: "If it is a government matter, I will see you in reference to it." Gower came the next day, and had a conversation with the complainant at his office, to which conversation he instructed his stenographer to listen. Gower said that he was sorry complainant was opposed to having his biography written, but that this was something entirely different from the ordinary work of the kind, as it was a national affair, to which the complainant replied that, if it was a government matter, he would give him some facts. Complainant then says that he asked him how the government came to take the matter up, and Gower gave some explanation, using the names of some senators or of a representative, and saying that the bill had been introduced to make an appropriation for the

work which was to be sent to each ambassador and consul. At that interview the complainant signed a subscription blank binding himself to take a copy of the work at $10 a copy. The complainant will not swear that Gower used the word "government," but does say that he constantly used the word "national." Complainant used the word "government," however, without correction from Gower. On the 6th complainant says he learned of the character of the work, which was not in any sense under the patronage of the government. Next morning, on the 7th, he went to the office of the defendant and asked for White, one of the defendant's officers. He saw Gower at the time, who conceded that it was not a government work, but that the government had subscribed for a number of volumes. Complainant then told Gower that he wished to cancel his subscription, and was recommended to White, who subsequently came in and refused to cancel the subscription, and to refrain from publishing the facts. On the 15th of January the complainant wrote, making a formal tender to rescind the subscription, and demanding that they refrain from publishing the facts. The complainant's stenographer, who was in the office at the time of the interview, swears that she listened to the conversation, as she was instructed, on December 3d, and that the complainant told Gower he disliked publicity of this kind, whereupon Gower said that this was entirely different from anything gotten out before, it was a national affair; that he also spoke of an appropriation by the government; that he constantly used the word "national." The impression she received from the conversation was that the Cyclopedia was compiled and published under the direction of the United States.

These two affidavits constituted the complainant's direct proof. The defendant's proof consisted of Gower's affiadivt, in which he denies that he ever said anything from which it might be inferred that the publication was a "government affair." At the interview on December 3d he says that he started by saying that this work was entirely different from the usual publications, for it was a national affair. He does not remember the complainant's saying it was a government matter. He denies that he said that a bill was being introduced for an appropriation to send the work to all ambassadors and consuls. He concedes that he spoke of the subsidization of such biographies by foreign governments, and that there was no government publication of the sort in this country. He says that he told the complainant that this was a private publication for which the government had done nothing but subscribe for a number of copies. He concedes that he used the word "national" repeatedly, but asserts that none of his conversation was sufficient to convey to a reasonable mind the idea that the publication was a government enterprise. He denies that it was apparent to him that the complainant was being misled. He remembers the interview of December 7th, in which the complainant requested White not to publish the biography. At that interview the complainant told White that Gower had told him it was a government publication. White replied, asking whether he claimed there had been misrepresentation, to which he said, "No; not that, but a misapprehension." In White's affidavit he says that he talked with the complainant on December 7th, who told him he did not wish to have his biography published, and said that he could not say that there had been misrepresentations, but rather misapprehension. White then suggested that he let the publication of his own biography go over until the volume after next, and the complainant accepted this as a compromise of the whole matter, and that at the end of the interview he said, "Send along the books. I will pay for them"; that they sent the first six books on December 10th, and on January 12th, two more; that on January 11th the first six books were refused. The affidavit of Linen for the defendant says that on December 3d the complainant came to the office and said that he had been influenced to give his biography upon the belief that it was a government publication; that at that time he said nothing about cancellation; and that in the interview he disclaimed the position that there had been any misrepresentation, but said that there had been misapprehension. The complainant replied in an affidavit, repeating that Gower had stated that the government had made an appropriation for the publication, and gave the name of a senator who introduced the bill; that on December 7th at the interview in the defendant's office he stated that

Gower had told him that the work was a government one and used the words "false representations," which made Gower and White very angry, so that he said he would substitute the word "misapprehension," which seemed to satisfy them. He denies that he said: "Send along the books. I will pay for them."

This is all the testimony in the case, although there was a subsequent interview on the telephone between White and the complainant.

Hawkins & Delafield, for complainant.
Philip J. McCook, for defendant.

HAND, District Judge (after stating the facts as above). I think there can be no doubt that Gower gave Colgate to understand that the facts were not to be published in the ordinary biography which is used as a bait to practice upon the vanity of the simple and so procure their money, but was to be used in a publication issued under the auspices of the United States government. It is significant that Gower does not deny that Colgate used the word "government" in reply to his own questions. Both sides concede that Colgate was extremely unwilling in the first instance to allow his biography to be used, and was reluctantly forced into the enterprise; nor do I think that there can be any doubt that whether his inference was reasonable or not he certainly supposed that the book had the sanction in some form of the government. Colgate's immediate claim of being misled is strong corroboration of that fact, as is also the affidavit of McLaren, the stenographer. The question is whether Gower gave him reasonable grounds for believing so. The name of the publication somewhat lent itself to that misconstruction. Colgate swears distinctly that he used the word "government" a number of times, and McLaren corroborates him. The well-known urgency of book agents to procure subscriptions under these circumstances adds to my belief that Gower let the interview proceed after it would have been apparent to any reasonable man that Colgate was acting under a misapprehension, and supposed that the facts would not be published in the usual kind of biography. I therefore find that as a fact the reasonable implication of the conversation was that, if Colgate would tell the facts, Gower would use them in a biography having some official recognition from the United States government, instead of publishing the account which he was to get up from other sources as he had threatened.

Upon the law I think that the complainant is entitled to an injunction, though not upon precisely the same lines as was suggested upon the argument. The contract between the complainant and the defendant, as I have found it, was to publish the facts of his life in a book issued under the auspices of the United States government. Assuming that there was fairly to be implied a negative covenant not to publish the facts except in a biography issued under government auspices, we have the general rule now well established that where, as here, the defendant has received the consideration and the complainant cannot at law have adequate relief, an injunction will go to enforce the negative promise, even in a case where the court would not grant affirmative specific performance. While the law first grew up under cases of personal service, beginning with Lord St. Leonard's decision in

Lumley v. Gye, 1 D. G., M. & G. 604, it is by no means confined to such cases. Standard Fashion Co. v. Siegel-Cooper Co., 157 N. Y. 60, 51 N. E. 408, 43 L. R. A. 854, 68 Am. St. Rep. 749; Chic. & Al. Ry. Co. v. N. Y. L. E. & W. R. R. Co. (C. C.) 24 Fed. 516; Singer Sewing Machine Co. v. Union Buttonhole & E. Co., Holmes, 253, Fed. Cas. No. 12,904; Dwight v. Hamilton, 113 Mass. 175; De Mattos v. Gibson, 4 De G. & J. 276; Met. El. Supply Co. v. Ginder (1901) 2 Ch. D. 799; Wolverhampton & W. Ry. Co. v. London & N. W. Ry. Co., L. R. 16 Eq. 433, per Lord Selbourne.

The question is, therefore, whether here the promise to publish the facts in a government biography carried with it by implication the promise not to publish them in another kind of work. It is true that there was not that kind of inconsistency between the two which made it impossible to perform both promises. It was not like employing a chartered ship upon another voyage. De Mattos v. Gibson, supra. However, Colgate showed clearly enough that he would not have given the facts for any other purpose, and both parties understood that they were to be used only in a government biography. Colgate's position was that, since some account of his life was inevitable, he would disclose the facts if Gower would publish them, but that he would have nothing at all to do with the usual compilations which discredit the names of all those who lend themselves to their production. The commonest good faith requires the implication that he would not abuse the opportunity so given him by publishing them in a work which he from the outset found it necessary to assure Colgate that this was not.

No objection arises from the fact that the contract of subscription was in writing, because that clearly does not purport to cover the subject-matter of publishing the life, but was a mere subscription for the books themselves, regardless of their contents.

It is true that the bill of complainant does not specifically rest on contract. The bill is of a vague sort, sets up all the facts as a bill in equity should, and then prays for relief. It makes allegations of fraud and misrepresentation, and shows that the contract was made, what it was, and how the complainant's right ensued. It also shows the threatened breach. While, of course, a bill in equity must advise the defendant of the facts upon which the complainant relies, it does not have to state one of the limited causes of action known at law. A bill in equity which asks for relief not itself inconsistent, but justified by the stating, or narrative, part of the bill, is ordinarily sufficient, nor is the complainant limited to any given theory in law, provided he does not depart from the bill itself. Here the bill has no charge, no interrogatories, but confines itself to the narrative. It is quite as good as the bill in Briges v. Sperry, 95 U. S. 401, 24 L. Ed. 390. A court of equity interprets the bill so as to save its equity when possible (Street, Eq. Proc. § 288), and tolerates objections to its form only when taken at the outset, not at final hearing.

The defendant raises objection to the jurisdiction of this court on the score of the amount of the "matter in dispute." The matter in dispute is Colgate's right under the contract to prevent the use of the

facts derived from him in any biography other than one issued under government auspices. That right is not susceptible of certain valuation and must be fixed by either a jury, or a judge, from an estimate of the pecuniary recompense for the annoyance and chagrin involved. In this case it is, moreover, not limited by the injury suffered from a given infraction, because in analogy with the trade-mark cases it is the right itself which is at stake, not a specific violation. Colgate alleges that it is worth $2,000, and that is prima facie enough in the absence of bad faith or obvious exaggeration. Hilton v. Dickinson, 108 U. S. 165, 174, 2 Sup. Ct. 424, 27 L. Ed. 688; Barry v. Edmunds, 116 U. S. 550, 6 Sup. Ct. 501, 29 L. Ed. 729. I certainly cannot say that the value here laid is colorable under the act of 1875 in such sense that I must dismiss the bill. It may well be that to prevent the spreading broadcast of any kind of publication which will perpetuate the circumstantial details of his life would be worth to Colgate $2,000 or more. I remember that the right is not to prevent any facts from coming out, but only those which he himself told. However, it is one thing to have irresponsible persons tell what they can learn generally, and another to have them tell the details that you have told them yourself. In the absence of any proof that the facts which he did give out were merely formal or such as any one might learn, I must accept his own valuation under the usual rule. However, there is no jurisdiction over the contract of subscription. There were substantially two contracts here. By one Colgate agreed to take a set of books at $10 a volume, and in the other Gower agreed to publish the facts of Colgate's life in a government biography. The subject-matter of each is separate, and, as I have no jurisdiction over the subscription contract, the decree must be limited to an injunction against the defendant from using the facts so obtained.

Let a decree pass to that effect, with costs.