### UNITED STATES v. BORNN et al.
#### No. 6787.

District Court, E. D. New York.

April 23, 1937.

the defendant Bornn as principal and the defendant Royal Indemnity Company as surety. These bonds were given to protect the government in the event of failure on the part of Bornn to comply with the terms and requirements of certain permits pursuant to which he was authorized to withdraw from government distilleries, without payment of tax, large quantities of specially denatured alcohol for industrial use only. The three bonds aggregated the sum of $100,000, and these two causes of action are limited to that amount.

These two causes of action are identical in factual content. The difference is with respect to the measure of damages to be applied in ascertaining the amount which plaintiff is entitled to recover for Bornn's breach of obligations imposed upon him by the terms of the permits and by the laws and regulations which, as permittee, he was required to obey.

The third cause of action is against the defendant Bornn alone. It is based upon the same transactions and the same course of conduct on the part of Bornn. The allegations in this action are that Bornn, in violation of his permits, caused the alcohol withdrawn tax free pursuant to his permits to be diverted to a use not contemplated within the permits, laws, and regulations which he was bound to obey. The measure of damages in this cause of action is for the amount of the basic tax computed upon the entire gallonage withdrawn by Bornn tax free for industrial use and diverted to a different and unauthorized use. It is brought under express statutory provision (U.S.Code, Ed. of 1934, title 26, § 1432, subds. (c) and (d), 26 U.S.C.A. § 1432 (c, d).

The complaint pleads the facts in all three causes of action upon which the government relies, the bonds being made a part of the pleadings. The salient portions of these undertakings will be referred to later in this opinion.

The record at bar contains no controverted issue of fact in any substantial sense. There were issued to Bornn two basic permits, No. 11740 and No. 20777, dated April 22, 1922, and March 31, 1926, respectively. These permits were issued in accordance with an application previously filed by him. The bonds were executed by the Royal Indemnity Company as surety and by Bornn as principal and filed with the proper official.

Leo J. Hickey, U. S. Atty., of Brooklyn, N. Y. (Vine H. Smith and William S. Perlman, Asst. U. S. Attys., both of Brooklyn, N. Y., William A. Tarver, Charles G. Mulligan, and Frederick J. Whelan, all of Washington, D. C., of counsel), for the United States.

House, Holthusen & Pinkham, of New York City (Henry F. Holthusen, Spencer Pinkham, and John K. Hawkins, all of New York City, of counsel), for defendants.

ABRUZZO, District Judge.

The plaintiff instituted this action against Frank Bornn, doing business as Bornn Distilling Company, and Royal Indemnity Company, a corporation, as defendants. There are three causes of action pleaded in the complaint. The first and second causes of action set forth in the complaint are pleaded against both defendants upon three bonds executed by

The amount of gallonage which was permitted to be withdrawn under these permits varied from time to time and, whenever there was an increase in the amount, Bornn, as permittee, was required to file further and increased security.

Under these permits, Bornn withdrew large quantities of specially denatured spirits. This phase of the proof was not contradicted and no detailed résumé is therefore necessary.

The denatured spirits withdrawn by him were made into a rubbing alcohol compound, and from January 1, 1924, up to December 31, 1925, this rubbing alcohol compound contained 92 per cent. pure alcohol, and was shipped to his customers in regulation pint size bottles. Labeled as Alco-Tone or Alco-Primo, some was sold in legitimate commerce. The greater portion of sales was made to persons, who to his knowledge, and with his encouragement and assistance, and even by his procurement, delivered his product to stills, or operators of stills where both the denaturants and the ingredients added by Bornn were eliminated and potable spirits recovered, so that they were fit for beverage use.

Bornn supplied to these persons who purchased his product a chemical in the form of a white powder, which he declared to be of great assistance of facilitating the recovery of the alcoholic spirits and the elimination of the denaturants and his own ingredients. In making shipment, the precaution was taken generally of requiring that the ostensible buyer should be a druggist or some one having the real or apparent right to deal in such preparations as rubbing alcohol. This would tend to avoid and reduce the likelihood of an official inspection.

A very large amount of his product, which subsequently found its way to illegitimate buyers and dealers, was distributed in the Buffalo area through the Rudin Drug & Sundry Company of Buffalo. Bornn handled this district skillfully and with a direct intent to avoid the law and regulations under which his permits were issued. His actions, to say the least, were highly questionable and proved beyond a doubt his guilty knowledge of the use to which his product was to be put. Freedman was his salesman and operated in this territory on a commission basis. He was instructed to get a wholesale druggist through whom shipments might be made without their looking suspicious.

A powder was furnished to this salesman with full instructions as to its use. Freedman thereupon made a contact with the Rudin Drug & Sundry Company and arranged that shipments would be made through that firm. In 1924 and 1925, 47,340 cartons of rubbing alcohol were shipped to Buffalo. It was shown that 40,000 cartons were actually trucked to various stills in the vicinity in and around Buffalo. Sam Sugarman was engaged by Rudin to perform that service. When this arrangement was made between Sugarman, the truckman, and Rudin, Moore, the general manager of Bornn, was present. Obviously, these cartons were taken to the stills for cleaning and redistillation.

The minimum quantity thus diverted in direct violation of Bornn's permits alone was 60,000 gallons. Of that amount, 92 per cent. was alcoholic spirits and after redistillation, 55,200 gallons of pure alcohol remained, or 110,400 proof gallons. It will be readily seen that this was more than sufficient to exhaust the maximum obligation fixed in the bonds in the event that the plaintiff was entitled to damages either on the first or second cause of action.

The plaintiff produced conclusive proof that similar conditions existed in Peoria and Scranton, where large amounts of this product was diverted and actually found its way to stills.

In addition, other gallonages are shown to have been diverted by shipment to persons intending to dispose of the products so obtained for uses which were unauthorized and which were not within the conditions upon which the government waived its tax lien at the time of withdrawal. Bornn gave advice and assistance as to how to eliminate the denaturing chemicals and his own ingredients. He provided demonstrations with a laboratory still in his own place of business as to the cleaning method which he recommended. He violated the terms of his permits, the laws and regulations flagrantly, with one idea in view only, to make large profits for himself. He never intended to keep within the terms of his permit, the regulations, or the law. His conduct indicates that clearly. His sole motive was to use the permits to evade the payment to the plaintiff of a just tax in order to enrich himself. He assisted directly in the violation of the terms of his permits, knowingly and willfully. This is borne out and corroborated in all of its essential details by the sale of the tremend-

ous gallonages which were cash sales. He placed no faith or trust in his co-law violators. Some of his sales, and to put it mildly, they were few, did get into the legitimate market. They were made upon credit. He was cognizant of the type of persons with whom he was dealing.

It was also proved on the trial that the same bottles that contained this so-called Alco-Tone or Alco-Primo and that were shipped to different destinations subsequently found their way back to his plant to be refilled. This was done through the medium of second-hand bottle dealers. Presumably, every factor of the disposition of his Alco-Tone or Alco-Primo to provide profits was carefully worked out at the very beginning.

Bornn, himself, did not testify. The trial took several days, and counsel for the defendant persistently urged that his client was too ill to appear in court or testify. The court elected to send its own doctor to make a physical examination of Bornn. The physician so appointed, after his examination, testified that Bornn's physical condition was such that he was able to come to court and testify.

Counsel produced a doctor who stated that Bornn's condition was such that it would be detrimental for him to come to court or to testify. Counsel for the defendant adroitly stated that he would not want to take the responsibility of asking his client to appear in court or to testify.

He did call a witness by the name of Moore, who was the general manager of the defendant and who had been so for many years. He had complete and full knowledge of all of the defendant's affairs and his customers. He admitted that he had received notice from the plaintiff of all the regulations that were put into effect respecting the defendant's permits. It was apparent that he was fully equipped to testify as to the important facts to which the witnesses for the government testified.

In spite of the damaging testimony given by the government's witnesses which strongly indicated an intention to flagrantly violate both the regulations in force and the law applicable to the defendant's permits, this witness stood strangely mute. The purpose of counsel swearing him and then asking no questions is bewildering to this court. His lack of testimony was of no assistance in determining the issues. The facts were promptly found by the court in favor of the plaintiff. This conclusion was inescapable.

The defendants rely solely upon questions of law to escape either partial or full liability. Some of these legal defenses upon which the defendants rested are to say the least far-fetched. The law and regulations upon which the plaintiff relied was set forth in full detail by the government. It is well to detail them in sequence in order that they may be more fully understood in their relationship to the case at bar.

Prior to the enactment of the National Prohibition Act, the Act of June 7, 1906 (34 Stat. 217 [26 U.S.C.A. §§ 1320 and note, 1322, 1323]), was in full force and effect. Section 1 of that statute (U.S.Code, 1925 Ed., title 26, § 481, 26 U.S.C.A. § 1320(a) provided as follows:

"Domestic alcohol of such degree of proof as may be prescribed by the Commissioner [of Internal Revenue], and approved by the Secretary [of the Treasury], may be withdrawn from bond without the payment of internal-revenue tax, for use in the arts and industries, * * * provided said alcohol shall have been mixed in the presence and under the direction of an authorized Government officer * * * with methyl alcohol or other denaturing material or materials, * * * suitable to the use for which the alcohol is withdrawn, but which destroys its character as a beverage and renders it unfit for liquid medicinal purposes. * * *

"The character and quantity of the said denaturing material and the conditions upon which said alcohol may be withdrawn free of tax shall be prescribed by the Commissioner [of Internal Revenue], who shall, with the approval of the Secretary [of the Treasury], make all necessary regulations for carrying into effect the provisions of this section [subsection].

"Distillers, manufacturers, dealers, and all other persons furnishing, handling, or using alcohol withdrawn from bond under the provisions of this section shall keep such books and records, execute such bonds and render such returns as the Commissioner [of Internal Revenue], with the approval of the Secretary [of the Treasury], may by regulation require. Such books and records shall be open at all times to the inspection of any internal-revenue officer or agent."

After the ratification of the Eighteenth Amendment, and in anticipation of its tak-

ing effect, the same administrative authority was continued under title 3 of the National Prohibition Act (U.S.Code, 1925 Ed., title 27, §§ 81–83 [27 U.S.C.A. §§ 81–83]).

In the National Prohibition Act (U.S. Code, 1925 Ed., title 27 § 88 [27 U.S. C.A. §§ 88]) it is stated: "All administrative provisions of internal revenue law, * * * are made applicable to this chapter in so far as they are not inconsistent with the provisions thereof."

The provision of title 26, § 481, quoted above, is continued in U.S.Code, 1934 Ed., title 26 § 1320 (a), 26 U.S.C.A. § 1320 (a).

Under the Act of June 7, 1906, the Commissioner of Internal Revenue from that time forward required bonds substantially in the form of those in suit herein. This administrative practice began under the act of 1906 and has ever since continued and still prevails.

In conjunction with this act, Regulation No. 30, revised October 12, 1917, Article 78, sets forth the manner in which the manufacturer shall file with his notice his bond in duplicate, with sureties satisfactory to the collector, and in a penal sum sufficient to cover the tax on all alcohol that may be, at any time, on hand, in transit or unaccounted for. This regulation also determines the form in which the bond shall be executed.

Section 81 of title 27 U.S.C.A. sets forth the manner in which withdrawal of alcohol tax free shall be made, and reads as follows:

"Withdrawal of alcohol tax free for denaturing and other enumerated purposes. Alcohol produced at any industrial-alcohol plant or stored in any bonded warehouse may, under regulations, be withdrawn tax free as provided by existing law from such plant or warehouse for transfer to any denaturing plant for denaturation, or may, under regulations, before or after denaturation, be removed from any such plant or warehouse for any lawful tax-free purpose.

"Spirits of less proof than one hundred and sixty degrees may, under regulations, be deemed to be alcohol for the purpose of denaturation, under the provisions of this chapter.

"Alcohol may be withdrawn, under regulations, from any industrial plant or bonded warehouse tax free by the United States or any governmental agency thereof; or by the several States and Territories or any municipal subdivision thereof or by the District of Columbia, or for the use of any scientific university or college of learning, any laboratory for use exclusively in scientific research, or for use in any hospital or sanatorium.

"But any person permitted to obtain alcohol tax free, except the United States and the several States and Territories and subdivisions thereof, and the District of Columbia, shall first apply for and secure a permit to purchase the same and give the bonds prescribed under chapter 2 of this title, but alcohol withdrawn for nonbeverage purposes for use of the United States and the several States, Territories and subdivisions thereof, and the District of Columbia, may be purchased and withdrawn subject only to such regulations as may be prescribed. (Oct. 28, 1919, c. 85, Title III, § 11, 41 Stat. 321.)"

Section 83 of title 27 U.S.C.A., regulates the establishment, bonding, and operation of industrial-alcohol plants, as follows: "Regulations for establishment, bonding, and operation of industrial-alcohol plants, denaturing plants, and bonded warehouses. The commissioner shall from time to time issue regulations respecting the establishment, bonding, and operation of industrial-alcohol plants, denaturing plants, and bonded warehouses authorized herein, and the distribution, sale, export, and use of alcohol which may be necessary, advisable, or proper, to secure the revenue, to prevent diversion of the alcohol to illegal uses, and to place the nonbeverage alcohol industry and other industries using such alcohol as a chemical raw material or for other lawful purpose upon the highest possible plane of scientific and commercial efficiency consistent with the interests of the Government, and which shall insure an ample supply of such alcohol and promote its use in scientific research and the development of fuels, dyes, and other lawful products. (Oct. 28, 1919, c. 85, Title III, § 13, 41 Stat. 321.)"

Article 18 of the 66th Congress, 1919, c. 85, Title 3, § 11, 41 Stat. 321 (27 U.S.C. A. § 81), applies to the method of providing for the securing of permits to obtain alcohol tax free. This section makes the following provision:

"11. Alcohol produced at any industrial-alcohol plant or stored in any bonded warehouse may, under regulations, be withdrawn tax free as provided by existing law from such plant or warehouse for transfer to any denaturing plant for denaturation,

or may, under regulations, before or after denaturation, be removed from any such plant or warehouse for any lawful tax-free purpose.

"Spirits of less proof than one hundred and sixty degrees may, under regulations, be deemed to be alcohol for the purpose of denaturation, under the provisions of this title [chapter]. * * *

"But any person permitted to obtain alcohol tax free, except the United States and the several States and Territories and subdivisions thereof, and the District of Columbia, shall first apply for and secure a permit to purchase the same and give the bonds prescribed under title II of this Act [chapter 2 of this title], but alcohol withdrawn for nonbeverage purposes for use of the United States and the several States, Territories and subdivisions thereof, and the District of Columbia, may be purchased and withdrawn subject only to such regulations as may be prescribed."

Section 13, article 18, 66th Congress, 1919, c. 85, title 3, 41 Stat. 321 (27 U.S. C.A. § 83), empowers the Commissioner from time to time to issue regulations, respecting the operation of industrial alcohol plants.

The permittee was notified from time to time of various regulations and of changes which were made in them, that were issued in conformity with the authority vested in the Commissioner to issue these regulations. These were all offered in evidence and the defendant's (Bornn) general manager, Moore, admitted receiving notification of all of the regulations submitted.

The government's contention based upon the law and regulations and the facts is set forth as follows:

"1. The use and disposition made by Bornn of the specially denatured alcohol withdrawn by him under his permits constitutes a clear violation of the permits themselves, of the laws and regulations relating to such spirits, and of the commitment expressed in the bonds set forth in the complaint.

"2. No discharge of the obligation was effected by the modifications made ,in the denaturing formulae, for those modifications were made in accordance with authorized regulations and in each instance had the effect of diminishing, not of increasing, the surety's risk.

"3. The government's right to recover substantial damages for breach of the conditions of the bonds is· clear, and no question is presented as to whether the measure of damages is the basic tax or the amount of $4.50 per wine gallon stipulated in the bonds, for the gallonage diverted is more than sufficient upon either computation to exhaust the maximum liability fixed in the bonds.

"4. The bond coverage available to the government for Bornn's diversions of specially denatured alcohol, in violation of his permits, is $100,000, the aggregate of the three bonds pleaded in the complaint and proved at the trial.

"5. Bornn's illicit disposition of the spirits withdrawn by him under his permits constitutes an evasion of the tax within the meaning of the statute upon which the third cause of action against him individually is based."

The lefendants on the other hand interposed a number of defenses which will be briefly summarized.

Their first attack is on the third cause of action. They contend that this must be dismissed because both the complaint and the proof are insufficient in law. That action relates solely to the defendant Bornn and not to the surety company. The government has asked for damages in the amount of $403,858.22.

However, the other contentions set forth by the defendants are correlated to this cause of action. For instance, the defendants throughout the trial were strenuously of the conviction that the bonds were never breached because they related only to "denatured alcohol," not "rubbing alcohol." As Bornn used and formally accounted for all of the denatured alcohol he withdrew, the surety company claims that it cannot be held liable.

The third contention of the defendants is that, as the first permit authorized the use of specially denatured alcohol in the manufacture of bay rum, the second and third bonds relate to this first permit. The first bond was for the sum of $25,000. The second bond was for $25,000 and the third for the sum of $50,000, totalling $100,-000, the amount involved in the case at bar.

In addition to the first permit, there was issued another permit, No. 20777, dated March 31, 1926 (Plaintiff's Exhibit No. 13), which relates to bay rum and Alco-

Tone and permits the withdrawal of 20,000 wine gallons for each thirty-day period.

The bonds filed by the surety contained a commitment "that the said principal shall not violate the terms of such permit and shall transport, store and use such denatured alcohol in accordance with the laws and regulations promulgated pursuant thereto and shall in all respects fully and faithfully comply with all the regulations thereunder respecting such transportation, storage and use. * * *"

In connection with that provision of the bond, the regulation of June 8, 1922 (Plaintiff's Exhibit 69 in evidence), referring to the use of specially denatured alcohol by a permittee "for the making of so-called rubbing or bathing alcohol," prescribed "that sales of such products should be confined to persons legitimately engaged in the bona fide drug trade, or operating hospitals, sanatoriums, Turkish bath establishments, or other establishments where alcohol has customarily been used for massage or other external purposes."

■ This regulation condemned "the making of sales to such persons in quantities in excess of their reasonable requirements," and went into effect long before the period covered by the complaint at bar. This was known by Bornn's general manager, Moore. See testimony of Moore, pp. 634, 635. Knowledge to the principal is knowledge to the surety.

A careful analysis of the testimony indicates that the defendant clearly violated the permit, law, and regulations that are directly in point in the case at bar. This can be readily seen by a perusal of the testimony as adduced by the government's witnesses. This evidence stands uncontradicted, undenied, and no explanation was offered by the defendants.

■ That there was a flagrant violation of the regulations of June 8, 1922, is self-evident. One glaring example is the vast sales to the Rudin Drug & Sundry Company. While this drug company was engaged in a legitimate enterprise, the testimony was clear and convincing that Rudin never used this rubbing alcohol in legitimate trade and that Bornn knew it. Shipments under the name of the Rudin Drug & Sundry Company were made by Bornn apparently to only allay the suspicion that they were illicit. He nor Moore contradicted the positive testimony that these shipments found their way into the hands of "bootleggers" without Rudin's

ever receiving the shipments. Payment for these goods were made in cash against bills of lading. Whether Rudin made the payments or not is not clear. These sales were of large quantities and were manifestly in excess of their reasonable requirements. The defendants offered no explanation of this. They were content to rest on the technical defense that the bonds were not breached because they related only to "denatured alcohol" and not "rubbing alcohol."

■ The argument apparently advanced is that, when Bornn made "denatured alcohol" into "rubbing alcohol," the responsibility of the defendants to the government ceased. Evidently the law and regulations are not to be considered as having any force or effect if this argument is tenable.

The argument offered is not sound. Under the permit, regulations, and the law, it was clear that it was the intention that this denatured alcohol be transformed into authorized and legitimate uses only, particularly in view of the fact that the plaintiff waived its tax. The recipient of this privilege was charged with the responsibility of seeing that its product reached legitimate and authorized uses. In the event that this denatured alcohol, withdrawn tax free, was turned into potable liquid by the assistance of the defendants in violation of the permit, regulations, and the law, they were then liable accordingly for their intentional and unwarranted acts. The surety company shares this liability up to the amount of its bonds.

Bornn was directly responsible under the evidence, the permit, regulations, and the law for a large quantity of this denatured alcohol getting into illegitimate and unauthorized uses. The defendants, therefore, should be made to respond in money damages for their acts to the plaintiff.

■ The defendants' position that the first permit authorized the use of denatured alcohol in the manufacture of bay rum and that the second and third bonds relate to this first permit cannot be sustained. They have not taken into account the second permit which relates to "Alco-Tone" or "Alco-Primo." The permits issued related in their broad interpretation to a lawful use of the denatured alcohol withdrawn. Whether bay rum, "Alco-Tone," or "Alco-Primo" was made from this denatured alcohol in compliance with permit is not the germane issue. The real issue, irrespective of what product was made, is whether the denatured alcohol

withdrawn reached illegitimate and unauthorized uses through the acts or assistance of the defendants.

█ That the government had an inherent right to its revenue or tax upon the withdrawal of the denatured alcohol seems to be well settled. The law and regulations were put into effect in order that the plaintiff might be amply protected in the collection of its revenue. A violation of any of these regulations or the law by any permittee made him liable for a response in damages. The surety company guaranteed the faithful performance of all the laws and regulations with respect to the permits up to the amount of their bonds and the authorities so hold.

In Various Items of Personal Property et al. v. United States, 282 U.S. 577, 51 S. Ct. 282, 75 L.Ed. 558, the government claimed fraud in the withdrawal of alcohol ostensibly for nonbeverage but in reality for beverage purposes under the Revenue Act of 1918 (40 Stat. 1105) as amended.

At page 580 of 282 U.S., at page 283 of 51 S.Ct., 75 L.Ed. 558, the following language appears as a pronouncement of a doctrine: "The alleged diversion was accomplished by the withdrawal of pure alcohol, which was then specially denatured and made unfit to drink, and in that condition was sold. Petitioners contend that this was a diversion not of distilled spirits, but of denatured alcohol, and, therefore, not within the reach of section 600 (a). But upon the evidence and the instructions of the court it was open to the jury to find that the alcohol was specially denatured to the contemplated end that, after it had passed into the hands of the purchasers, it would be 'cleaned' and finally used for beverage purposes. In that view it is entirely accurate to say that the alcohol was diverted to beverage purposes, the special denaturing being only an intervening step."

In the case of Helvering v. Druggists' Specialties Co. (C.C.A.) 76 F.(2d) 743, 745, it was charged that the complainant had in bad faith violated the terms and conditions of its permit and certain other provisions of the National Prohibition Act and regulations promulgated thereunder. The opinion stated:

"The statutes however said nothing about permits. They apparently left that to the Commissioner under authority which it conferred upon him to 'make all necessary regulations for carrying into effect the provisions of this Act.' The Commissioner made such regulations and by Regulations No. 30, revised August 22, 1911 and further revised October 12, 1917, provided, among other things, for a permit system to control the withdrawal, sale and use of specially denatured alcohol free of tax. * * *

"Of course the Acts of 1906, 1907 and 1913 were essentially and exclusively revenue measures enacted by the Congress under its constitutional taxing powers and Regulations 30 were promulgated to prevent fraud upon the revenues and ensure their collection. The original control of tax-free denatured alcohol through a permit system was not devised for preventing the manufacture, sale and transportation of intoxicating liquor for in those times there were no such constitutional inhibitions. It was a revenue protection system in force years before the Eighteenth Amendment was adopted and was the same in design and purpose as that contemplated in title 3 and sections of title 2 of the National Prohibition Act so far as they had to do with revenues."

█ No person has an inherent right to withdraw and use denatured alcohol tax-free. It is a privilege accorded by the Congress upon terms and conditions imposed upon those who accept it.

It is apparent that the quantity of denatured alcohol diverted by the defendants entitles plaintiff to a judgment against both defendants on the bonds for the full maximum amount to which liability thereon is limited. The gallonage diverted through the shipments via Rudin was more than 110,000 proof gallons (pages 430, 437, 440, 442). This testimony was strongly and circumstantially corroborated by the several drivers employed by Sugarman (pages 255, 256, 260, 261, 271, 272).

If the damages were measured by the amount of the basic tax on that gallonage, the total would far exceed the amount of the bonds, to wit, $100,000. If damages were computed on the same gallonage, using as the measure the sum of $4.50 per wine gallon of denatured spirits, as stipulated in the bond, the amount of the damages would be even a greater amount. It is, therefore, unnecessary to determine which measure of damages should be used by the court since in any event the amount of the bonds would be exhausted.

Upon either unit of measure, the plaintiff's right to recover up to the amount of the bond coverage is clear and the plaintiff

is entitled to a judgment against both defendants on the first and second causes of action for the sum of $100,000. These figures do not take into account other gallonages proved to have been diverted.

The defendants submitted with their memorandum proposed findings of fact and conclusions of law. The court sees no reason for passing upon them. Both sides waived their right to a trial by a jury, and it was stipulated that the court could render its opinion without findings of fact and conclusions of law. The attorney for the defendants stated at page 4 of the testimony:

"Mr. Pinkham: I think that is perfectly satisfactory, if the Court please. I don't care anything about findings and conclusions. I would like however a little general understanding that there will be an opinion by the Court which in a general way will set forth the reasons for the decision. I think that is one of the advantages to be gained by waiving a jury."

Section 773, U.S.Code, title 28 (28 U. S.C.A. § 773), provides: "Issues of fact in civil cases in any district court may be tried and determined by the court, without the intervention of a jury, whenever the parties, or their attorneys of record, agree to waive a jury by a stipulation in writing filed with the clerk or by an oral stipulation made in open court and entered in the record. The finding of the court upon the facts, which may be either general or special, shall have the same effect as the verdict of a jury. (As amended May 29, 1930, c. 357, 46 Stat. 486.)"

The authority for this discretionary right of the court is found in Globe Indemnity Co. v. Southern Pacific Co., 30 F. (2d) 580, 583 (C.C.A. 2d Cir.), and in Vicksburg, etc., Ry. Co. v. Anderson-Tully Co., 256 U.S. 408, 415, 41 S.Ct. 524, 527, 65 L.Ed. 1020.

The third cause of action which is against Bornn alone is brought on the statute which provides as follows: "In case of a willful attempt in any manner to defeat or evade tax, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time." This provision appears at present in U.S.Code (Edition of 1934), title 26, § 1432 (c), 26 U.S.C.A. § 1432 (c). A similar provision was contained in the Revenue Acts of 1924 and 1921. It is well settled that the basic tax is a true tax and in no sense a penalty. Various Items of Personal Property et al. v. United States, 282 U.S. 577, 579, 580, 51 S.Ct. 282, 283, 75 L.Ed. 558. It imposes a responsibility for payment of the tax upon the person or persons attempting to evade it.

The total quantity of Bornn's product diverted to illicit uses, which were not tax exempt, was 99,202 cartons, arrived at as follows:

| Shipped to: | Cartons |
| --- | --- |
| Springfield, Mass. | 220 |
| New York City, N. Y. | 2,682 |
| Buffalo, N. Y. | 44,849 |
| Rochester, N. Y. and Utica, N. Y. | 9,250 |
| Scranton, Pa. | 3,300 |
| Chicago, Ill. | 17,051 |
| Peoria, Ill. | 5,300 |
| Minneapolis, Minn. ⎫ Sioux City ⎬ Butte, Mont. ⎭ | 5,450 |
| Springfield, Ill. | 1,500 |
| Kansas City, Mo. | 9,600 |
| Total | 99,202 |

The gallonage in that number of cartons thus tabulated is 148,803 gallons. (there being 12 pints, or 1½ gallons in a carton). The lowest alcohol content of any of Bornn's products, according to the testimony of Moore, was 70 per cent., and during most of the period covered by the complaint it was 92%. Multiplying the number of gallons shown to have been diverted by Bornn by 70 per cent. shows a total of alcohol spirits thus diverted amounting to 104,162.10 gallons. This is pure alcohol, and the number of proof gallon is, therefore, represented by twice this figure, viz., 208,324.20 proof gallons. The basic tax of $2.20 per proof gallon on this amounts to $458,313.24. However, as the complaint alleges the diversion and the evasion of the tax by Bornn in respect to 183,571 proof gallons, this gives rise to a tax liability of $403,858.22 for which the plaintiff is entitled to judgment against Bornn individually.