**GRANZ v. HARRIS.**

United States District Court
S. D. New York.
July 24, 1951.

---

Bergerman & Hourwich, New York City, Joseph Calderon, New York City, for plaintiff.

M. Warren Troob, New York City, for defendant.

McGOHEY, District Judge.

The complaint seeks rescission of a contract between the plaintiff and the defendant's assignor, damages for its alleged breach by the defendant, accounting of defendant's profits, a permanent injunction and counsel fees as provided for in the contract. The plaintiff, an impressario and promoter of musical presentations and jazz concerts, is a citizen of California. The defendant, a citizen of New York, manufactures phonograph records and sells them at retail to the public. The amount in controversy is sufficient for diversity jurisdiction.

The plaintiff has produced and presented concerts in from 35 to 50 cities throughout the United States annually from 1945 to the present, under the designation "Norman Granz' Jazz At The Philharmonic." The words "Jazz At The Philharmonic" have since 1945 become associated in the public mind with the plaintiff, and denote a performance by jazz musicians organized, supervised and presented by him. In the presentation of these concerts the plaintiff hired the performing musicians, paid their salaries, rented the concert hall, advertised the presentation, and sold admission tickets. He selected the musical compositions to be played, and during the performances directed the order in which each instrumentalist performed and the general manner of the musical rendition. He also acted as master of ceremonies.

Prior to August 15, 1945, the plaintiff caused to be made a recording of a complete three-hour concert given in Los Angeles, California, by "Jazz At The Philharmonic." This was made on a sixteen-inch acetate disc revolving at the rate of 33⅓ revolutions per minute. In the phonograph record industry such an acetate disc is known as a "master" presumably because it can be and generally is used in the first step of the process of manufacturing ordinary disc phonograph records. In that process each acetate master is electroplated to produce a metal master, which in turn is electroplated to produce a metal mother, which in turn is electroplated to produce a metal stamper, which is used in a pressing machine to stamp out the shellac commercial disc phonograph record. A record thus manufactured will be the same size as its master and will play properly only when revolving at the same number of revolutions per minute. Thus if the sixteen-inch master had been used in this process it could have produced only sixteen-inch records playable at 33⅓ revolutions per minute. A master can also, however, be played on a phongraph like an ordinary record. When so played its content can be re-recorded in whole or in part on new acetate records or masters of different sizes and revolving at different

speeds. That indeed is how the plaintiff used the sixteen-inch master. He re-recorded on new twelve-inch masters revolving at 78 revolutions per minute, that part of the sixteen-inch master containing the rendition of two musical compositions entitled "How High The Moon" and "Lady Be Good" together with the audience reaction which followed the playing of each. Three twelve-inch masters were required for each composition. These six twelve-inch masters were transferred to one Moe Asch pursuant to an agreement dated August 15, 1945. Asch thereafter assigned the agreement to the defendant and delivered to him the six masters which are hereafter referred to as the "subject masters."

The agreement provides in part as follows:

"Witnesseth:

"That Whereas, the parties hereto are desirous of entering into a written contract confirming the oral arrangement heretofore made by and between them respecting the terms and conditions concerning the sale by the first party to the second party of certain record masters comprising the following tunes: 'How High The Moon' and 'Lady Be Good';

"Now, Therefore, for and in consideration of the mutual covenants to be kept and performed by the parties hereto, the parties agree as follows:

"(1) First party hereby and herein agrees to sell to the said second party, and second party agrees to buy from first party, those certain masters of a record album generally known and described as 'Jazz At The Philharmonic,' which includes only Volume 1.

"(2) In connection with the use by the second party of said album, it is distinctly understood and agreed that at all times in connection with its said use, second party shall use the terms 'Presented by Norman Granz.'

"(3) It is also understood and agreed that at all times the album so sold must contain the original explanatory notes as written by first party herein, without any changes of any kind, without the written permission of the first party herein.

"(4) It is understood and agreed that in the event any of said masters are sold, that the purchaser or purchasers shall be bound by all the terms, conditions and provisions of this agreement.

"(5) In consideration of the sale of said masters as aforesaid, the said second party agrees to cause to be paid to first party the following sum of money: * *."

The money consisted of $1850 payable on or before December 15, 1945 and, in addition, royalties of fifteen cents or five cents for each record sold at retail depending on its retail price. Royalties were to be adjusted upward if production costs decreased. There is also a provision for counsel fees if plaintiff be required to engage an attorney to enforce any of the terms of the agreement.

On February 28, 1947, the present parties, by written stipulation, amended the agreement so as to relieve the defendant, upon payment of $5,500 which he then made, from the obligation to pay royalties thereafter.

This circumstance disposes of the defense that in 1945 Harris was relieved of all obligations under the agreement by the assignment of it and the physical transfer of the subject masters with all his rights and title thereto, to International Record Sales Co., a New Jersey corporation. The latter was merely a dummy, owned and controlled by the defendant. Whatever business it did, if any, was done in the defendant's place in New York. International had only a mailing address in some small shop in New Jersey for which the defendant paid a trifling rent. It is inconceivable that Harris would have paid out $5,500 in February, 1947 to be relieved of the agreement if he had in truth assigned it to a stranger more than a year before. The acts of which the plaintiff complains began in 1948 and have continued up to the date of trial. They were done by this defendant. If they are actionable, he is the one from whom the plaintiff has a right to seek redress

From 1945 up to 1948, the defendant used the subject masters only in the manufacturing process described above to produce twelve-inch phonograph records which played at the rate of 78 revolutions per minute. He sold these only in sets in an album binding which conformed in all respects with the terms of the agreement. Some time in 1948, he re-recorded the musical content of the subject masters on to new ten-inch 78 rpm masters, from which he then manufactured phonograph records of the same size and speed. In 1950, he re-recorded the content of the subject masters on one new ten-inch master which revolved at 33⅓ rpm and from this manufactured records of the same size and speed for retail sale. The latter were not enclosed in an album binding but in a paper "sleeve" which, however, used the designation "Jazz At The Philharmonic," the credit line "Presented by Norman Granz" and the explanatory notes prescribed in the agreement. The ten-inch 78 rpm records he sold in an album the covers of which concededly did not conform to the terms of the agreement in that, although it bore the designation "Jazz At The Philharmonic," it did not use the credit line "Presented by Norman Granz" and, in place of the original explanatory notes prepared by the plaintiff, there were substituted some notes written by an employee of the defendant. These album covers were later corrected, however, when the plaintiff called the matter to the defendant's attention. There was no testimony as to how many of the offending albums were sold nor for how long a period they were on sale. And there was no testimony that the omissions and substitutions in the album in any way detracted from plaintiff's standing in his field or that he was in any way damaged thereby. Accordingly, I find that the plaintiff has failed to sustain his claim as to the offending album covers.

The use of the subject masters for re-recording on to the ten-inch records is claimed to be a violation of the agreement in several respects. First, it is said that under the agreement the defendant acquired merely a license to use the subject masters for the manufacture of twelve-inch 78 rpm records by the process above described. Second, it is said that since, when the content of the subject masters was re-recorded on to the ten-inch 78 rpm masters, there was necessarily eliminated some part of the sounds recorded on the subject masters, this deletion destroyed or at least substantially detracted from the artistic quality of the musical performance with corresponding detriment to the plaintiff's reputation. Third, this re-recording and deletion were done under the supervision of a "jazz expert" employed by the defendant for the purpose. This it is claimed made the contents of the ten-inch 78 rpm masters something entirely different than the plaintiff's production as recorded on the subject masters, and thus the use of the designation "Jazz At The Philharmonic," the line "Presented by Norman Granz" and the latter's explanatory notes could not lawfully be attributed to these ten-inch 78 rpm records.

As to the first point, the plaintiff's theory is that the agreement was merely a license to the defendant to use the subject masters only to make twelve-inch 78 rpm records by the described manufacturing process and that the plaintiff retained a common law property right in the musical production which was violated by any other use of the subject masters. The question of common law property right is hereafter considered in connection with the claim based on the 33⅓ rpm records. Here it is sufficient to consider whether the agreement was one of sale or license. The parts of it quoted above, I think, supply the answer. They leave no doubt that the transaction was a sale. Nothing in the instrument suggests that the words "sale," "sell," and "sold" were there used in any but their normal meaning. The provisions with respect to the designation, the credit line and the explanatory notes on the album covers are not inconsistent with a sale and complete transfer of title to the six subject masters. The defendant, therefore, clearly got more than a mere license. He became the undisputed owner of the subject masters. He was not limited to using them only in the manufacture of

twelve-inch 78 rpm records, but was free to use them for re-recording. He was, of course, obligated to use the prescribed designation, credit line and explanatory notes in the sale of any records he manufactured.

As to the second point, it is, of course, obvious that the ten-inch masters revolving at the same rate as the twelve-inch masters would not be able to re-record the full content of the larger records. But in comparing both as played in the court room, I could note only this difference: that the smaller records seemed to reproduce less of the audience reaction than the larger ones. I could not detect any deletion of music in them. This opinion was substantiated by Mr. John Hammond, a concededly qualified expert on jazz music, called by the plaintiff. He testified that he thought he noted some deletion of music in the smaller record, perhaps a bar or two. But he could not say for sure. Neither could he say whether anything but part of the audience reaction was deleted. Moreover, he declined to say that such deletion as he thought he detected in any way detracted from the artistic quality of the rendition. That, he said, was a matter of individual taste; some listeners might not like it, while others might think it an improvement. I find, therefore, that the alleged deletion of part of the musical content of the subject masters was not proved. The audience reaction consisted of whistles, cheers and screams. These were not claimed to be the product or creation of the plaintiff's skill or talent, and no authority has been cited to sustain or even suggest that he had any property right to them or to their reproduction. I think he had none.

It is true that ten-inch 78 rpm records were re-recorded under the supervision of defendant's expert. But the plaintiff's contribution to the original musical production, whatever that amounted to, was not changed or affected in any way; neither was the musical performance. Accordingly, when the defendant, at the plaintiff's insistence, corrected the album covers of the ten-inch 78 rpm records to conform to the agreement, he was not, as claimed, attributing to the plaintiff the work of someone else. Moreover, there was no testimony that the plaintiff was damaged in any way whatever by what was done.

In August, 1945, there had not yet been developed for public use a phonograph record revolving at $33\frac{1}{3}$ rpm. That development occurred about three years later. The plaintiff, therefore, urges that production of a $33\frac{1}{3}$ rmp record of plaintiff's rendition of the compositions as recorded on the subject masters was not and could not have been within the contemplation of the parties to the agreement. Accordingly, he asserts that the right to re-record from the original sixteen-inch $33\frac{1}{3}$ rpm master on to such a ten-inch $33\frac{1}{3}$ rpm record was reserved to himself since it was not in terms granted by the agreement. This claim is based partly on the theory that the agreement granted merely a license to use the subject masters to manufacture only twelve-inch 78 rpm records and partly on the theory that the plaintiff has a common law property in the musical productions themselves, separate from the property he had in the subject masters prior to their sale. The license theory has already been disposed of. It is equally clear that if the plaintiff had any common law property in the musical productions it did not survive the sale of the subject masters.[1]

There is one further claim to be considered. The defendant has sold ten-inch 78 rpm records separately, that is, not in an album. This is said to be a violation of the agreement. I think it is not. The latter does not prohibit sale of single records, and no such prohibition is fairly inferable from the language used. Paragraph (4) seems to contemplate that less than all of the subject masters might be sold by the defendant; for example, those recording only one of the musical compositions. Moreover, the royalty provisions seem clearly to assume that single records would be sold. The provisions concerning the designation, credit line and notes would, of course, apply to the sale of single records, but no testimony was offered that

1. RCA Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, certiorari denied, 311 U.S. 712, 61 S.Ct. 393, 85 L.Ed. 463.

these were not complied with in the sale of single ten-inch 78 rpm records.

Accordingly, the defendant is entitled to judgment on the merits together with costs.

Submit findings and conclusions.