**GRANZ v. HARRIS et al.**

No. 240, Docket 22324.

United States Court of Appeals
Second Circuit.

Argued May 15, 1952.

Decided Aug. 20, 1952.

car itself, that he first saw the car 75 to 80 feet away, that it was then veering to the left and across to the left side of the highway; that he saw the driver of the car at fifty-five or sixty, somewhere between fifty and sixty feet away and that he apparently was looking in toward the lumber yard, and I believe the evidence is that he never changed that view but continued to look toward the lumber yard. Now then if I am in error about that, you members of the jury will correct me, and remember what the testimony was.

"Now then, if you find and believe from a preponderance of the evidence that the operator of this car, the deceased, was in a position of imminent peril and oblivious to that peril of colliding with the car and that in the exercise of the highest degree of care the operator of the defendant's car could by the blowing of the horn have warned him and thus averted the collision, it would be your duty to find a verdict for the plaintiff. You must determine when he became in a position of imminent peril, when the operator of the defendant's car had a right to believe under the factual situation as it existed there, when he was in a position of imminent peril, that is, when it became apparent that he was not going to turn his automobile, that he was oblivious to the peril and inevitably if the course were maintained must collide with the car. Now, after that became obvious to Mr. Estes, could he then in the exercise of the highest degree of care within the time that was allowed to him, considering the distances, etc., and the rate of speed, have blown his horn and averted the accident, then it was his duty to do so and a failure to do so would be negligence for which the defendant would be liable."

SWAN, Chief Judge.

This is an appeal by the plaintiff from a judgment dismissing his complaint on the merits after trial to the court without a jury. The complaint sought rescission of a contract of sale of master phonographic recordings of portions of a jazz concert presented by the plaintiff, damages for breach of the contract, an accounting of profits, a permanent injunction, and attorney's fees in the amount of $3,000. Federal jurisdiction rests on diversity of citizenship. The district judge rendered an opinion, reported in 98 F.Supp. 906, and made detailed findings of fact and conclusions of law in conformity with his opinion. Only two of the findings of fact are attacked by the appellant. They will be discussed hereinafter.

Norman Granz is a well-known promoter and producer of jazz concerts under the designation "Jazz At The Philharmonic." One such concert he caused to be recorded in its entirety on a sixteen-inch master disc from which he re-recorded on six twelve-inch master discs that part of the concert constituting the rendition of two musical compositions entitled "How High the Moon" and "Lady Be Good." These master discs, three for each composition, revolved at 78 revolutions per minute, and were usable in manufacturing commercial phonograph records of the same size and playable at the same speed as the master discs. Granz sold the master discs to the defendant pursuant to a contract dated August 15, 1945.[1] The contract required that in the sale of phonograph records manufactured from the purchased masters the defendant should use the credit-line "Presented by Norman Granz" and explanatory notes which Granz had prepared. Some time in 1948 the defendant re-recorded the musical content of the purchased masters on ten-inch 78 rpm masters from which he manufactured phonograph records of the same size and speed. Such records he sold both in an album and separately. Concededly, at first the album cover did not conform to the contract in that, although it bore the designation "Jazz

Bergerman & Hourwich, New York City, (Joseph Calderon, New York City, of counsel), for appellant.

Michael Warren Troob, New York City, for appellee.

Before SWAN, Chief Judge, and AUGUSTUS N. HAND and FRANK, Circuit Judges.

1. Actually the contract was made with Moe Asch and by him assigned to the defendant.

At The Philharmonic" it did not contain the credit-line or the explanatory notes, but the court found that the cover was later corrected upon the plaintiff's demand. He found also that there was no deletion of music in the ten-inch 78 rpm records. In 1950 the defendant re-recorded the entire contents of the purchased masters on a ten-inch 33⅓ rpm master and from this manufactured records of the same size and speed for retail sale.

The questions presented by the appeal are whether any right of the plaintiff was violated by the defendant: (1) by manufacturing and selling ten-inch 33⅓ rpm records; or (2) by manufacturing and selling ten-inch 78 rpm records; or (3) by selling records singly instead of as part of an album containing both "How High the Moon" and "Lady Be Good."

On the authority of RCA Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, certiorari denied 311 U.S. 712, 61 S.Ct. 393, 85 L.Ed 463, and a finding that the contract was one of sale rather than license, the district court answered the first question in the negative, 98 F.Supp. 906, 910. We agree with this conclusion and see no need to add to his opinion.

He also gave a negative answer to the third question, 98 F.Supp. 910–911. We adopt his reasoning and conclusion on this point also.

Determination of the second question turns upon findings of fact. Obviously a ten-inch record revolving at 78 revolutions a minute has a shorter playing time and a smaller content than a twelve-inch record revolving at the same speed. Findings 25 and 26 state that all that was deleted in the smaller record was audience reaction consisting of whistles, cheers and screams;[2] that there was no deletion of music, and the plaintiff's contribution to the original musical production was not changed or affected in any way; and, "Accordingly, when the defendant, at the plaintiff's insistence, corrected the album covers of the ten-inch 78 rpm records to conform to the agreement, he was not, as claimed, attributing to the plaintiff the work of some one else." The court based his finding that there was no deletion of music on his own listening to the records (exhibits 4 and 14 played in the court room) and on the testimony of Mr. Hammond, a musical expert called by the plaintiff. A perusal of this expert's testimony discloses statements patently at odds with the judge's finding.[3] Nor can we understand, after ourselves listening to the records, the judge's finding that nothing but audience reaction was omitted from the ten-inch records. Fully eight minutes of music appear to us to have been omitted, including saxophone, guitar, piano and trumpet solos. In our opinion the trial judge's finding

2. It is not claimed, nor could it be successfully, that the reaction of the audience was the product of the plaintiff's skill or talent, or that he had any property right to it or to the reproduction of it.

3. Hammond's testimony reads in part as follows:

"A. It has a very bad cut at the end of the first side. I mean there is a break of one, definite, and two bars, I think. The whole musical effect of the 12-inch record would seem at least to me to be disturbed.

"Q. There was a break? A. There was a break and about half of the chorus was left out to the end of the chorus so that the—well. I don't know; I have said enough.

"Q. No, I wish you would continue, Mr. Hammond, to explain it. A. Well, the saxophone chorus is cut more or less in the middle, and then the start of the new side does not take up where the other side left off, and then immediately you get into the drum solo, and while I think for the average listener it would be rather difficult for the ear to detect, the structure of the performance would appear to be altered. * * *

"Q. Do you know after listening to both those records, Mr. Hammond, whether or not there was any deletion of the solo? A. To my ear it definitely sounded like a deletion there. Now, I may be wrong, but I was not looking for it and it struck me.

"Q. Then you who are thoroughly familiar with jazz and the jazz field, and having just listened to that, cannot decide whether or not there was a deletion? A. Oh, I would say there was. I state definitely that there did appear to be a deletion.

"Q. There appeared to be. Well, would you know definitely whether there

that there was no substantial musical deletions is erroneous.

 We are therefore faced with the question whether the manufacture and sale by the defendant of the abbreviated ten-inch records violated any right of the plaintiff. Disregarding for the moment the terms of the contract, we think that the purchaser of the master discs could lawfully use them to produce the abbreviated record and could lawfully sell the same provided he did not describe it as a recording of music presented by the plaintiff. If he did so·describe it, he would commit the tort of unfair competition.[4] But the contract required the defendant to use the legend "Presented by Norman Granz," that is, to attribute to him the musical content of the records offered for sale. This contractual duty carries by implication, without the necessity of an express prohibition, the duty not to sell records which make the required legend a false representation. In our opinion, therefore, sale of the ten-inch abbreviated records

was a breach of the contract. No specific damages were shown to have resulted.[5] As such damages are difficult to prove and the harm to the plaintiff's reputation as an expert in the presentation of jazz concerts is irreparable, injunctive relief is appropriate.[6] Hence we think the plaintiff was entitled to an injunction against having the abbreviated ten-inch records attributed to him unless he waived his right. As already noted the district court found that the album cover of the shortened record was corrected "at the plaintiff's insistence," and consequently the defendant was not "attributing to the plaintiff the work of some one else." The only evidence we can discover to support the theory of waiver is the following bit of testimony by the defendant who was called as a witness by the plaintiff:

> "As soon as I have received the letter from his [Granz's] attorney, probably about a couple of weeks later or month later, I called in my attorney and he said, What is Norman Granz's

was or was not? A. I would say there was, yes.

"Q. You would say there was? A. Yes.

"Q. What would you say was deleted? A. A few bars. How many, I did not count. * * *

"The Court: What, precisely, is it that you are describing now?

"The Witness: The 10-inch records, as opposed to the 12-inch records, I would say there was around three minutes taken out, three and a half, maybe, maybe almost four minutes.

"Q. Would that in your opinion make a substantial·different rendition of 'How High The Moon,' eliminating four minutes of that 12 minute piece? A. It would be different from the 12-inch, obviously. * * *

"Q. Now, you don't know what was eliminated, do you? A. No, I don't remember. It seems to me, as I recall, it was one instrumentalist, either one or two instrumentalists were eliminated, but I don't remember well enough, Mr. Troob, to tell you exactly what was eliminated."

4. See RCA Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, at page 90, where we said: "Nor need we say that insofar as radio announcers declare, directly or indirectly, that the broadcast of a Whiteman record

is the broadcast of a Whiteman performance, that conduct is a tort which Whiteman could enjoin. That would indeed be 'unfair competition'."

5. Conclusions of Law VI and VII, which the appellant does not question read as follows:

"VI. The plaintiff has not sustained his claim of damage due to defendant's failure to use the credit line 'Presented by Norman Granz' and defendant's use of explanatory notes other than plaintiff's on the ten-inch 78 rpm album covers.

"VII. The plaintiff has not sustained his claim of damage due to use of the credit line 'Presented by Norman Granz' and the use of his explanatory notes on the corrected ten-inch 78 rpm album covers."

6. See Drummond v. Altemus, C.C.E.D.Pa., 60 F.2d 338; Colgate v. James T. White & Co., C.C.S.D.N.Y., 180 F. 882, 885; Curwood v. Affiliated Distributors, D.C.S. D.N.Y., 283 F. 219; Waring v. Dunlea, D.C.E.D.N.C., 26 F.Supp. 338; Clemens v. Press Publishing Co., 67 Misc. 183, 122 N.Y.S. 206; Fairbanks v. Winik, 206 App.Div. 449, 201 N.Y.S. 487; Metropolitan Opera Association, Inc. v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483, affirmed 279 App.Div. 632, 107 N.Y.S.2d 795.

complaint, and he said he wanted to see his attorney, and he said he did not like the arrangement, and that was the question discussed, change the cover."

What this testimony means is far from clear. Even if Granz's attorney requested that the cover be corrected immediately and without waiting for the case to come to trial, we are not satisfied that this would necessarily operate as a waiver of Granz's right to an injunction, if sale of the abbreviated records under the legend "Presented by Norman Granz" constituted a breach of contract or the tort of unfair competition, as we have found it did. Whether he intended to waive all claims or whether that result would follow regardless of his intention depends upon what was said and done in the negotiations regarding correction of the cover. We think the case must be remanded for additional evidence on this point and a finding as to what, if anything, Granz did consent.

Dismissal of the complaint is affirmed with respect to sales of the ten-inch 33⅓ rpm records and with respect to selling records singly. With respect to the sale of ten-inch 78 rpm records and the claim of attorney's fees the cause is remanded for further proceedings in conformity with the opinion. One-half costs of appeal are awarded the appellant.

FRANK, Circuit Judge, (concurring).

1. I agree, of course, that, whether by way of contract or tort, plaintiff (absent his consent to the contrary) is entitled to prevention of the publication, as his, of a garbled version of his uncopyrighted product. This is not novel doctrine: Byron obtained an injunction from an English court restraining the publication of a book purporting to contain his poems only, but which included some not of his authorship.[7] American courts, too, have enforced such a right.[8] Those courts have also enjoined the use by another of the characteristics of an author of repute in such manner as to deceive buyers into erroneously believing that they were buying a work of that author.[9] Those courts, moreover, have granted injunctive relief in these circumstances: An artist sells one of his works to the defendant who substantially changes it and then represents the altered matter to the public as that artist's product. Whether the work is copyrighted or not, the established rule is that, even if the contract with the artist expressly authorizes reasonable modifications (e. g., where a novel or stage play is sold for adaptation as a movie), it is an actionable wrong to hold out the artist as author of a version which substantially departs from the original.[10] Under the authorities, the defendant's conduct here, as my colleagues say, may also be considered a kind of "unfair competition" or "passing off."[11] The irreparable harm, justifying an injunction, becomes apparent when one thinks what would be the result if the collected speeches of Stalin were published under the name of Senator Robert Taft, or the poems of Ella Wheeler Wilcox as those of T. S. Eliot.

7. Byron v. Johnston, 2 Mer. 28, 35 Eng. Rep. 851. See also Ridge v. English Illustrated Magazine, 29 T.L.R. 592.

8. See Clemens v. Belford, Clark & Co., D.C.N.D.Ill., 14 F. 728, 730–731; D'Altomonte v. New York Herald, 154 App. Div. 453, 139 N.Y.S. 200, modified 208 N.Y. 695, 102 N.E. 1101; Ben Oliel v. Press Publishing Co., 251 N.Y. 250, 167 N.E. 432.

9. Estes v. Williams, D.C.S.D.N.Y., 21 F. 189; Fisher v. Star Co., 231 N.Y. 414, 132 N.E. 133, 19 A.L.R. 937; See also Prouty v. National Broadcasting Co., D.C.Mass., 26 F.Supp. 265; cf. Gardella v. Log Cabin Products Co., 2 Cir., 89 F.2d 891, 895. Cf. Hogg v. Kirby, 32 Eng.Rep. 336.

10. Packard v. Fox Film Corp., 207 App. Div. 311, 202 N.Y.S. 164; see also Curwood v. Affiliated Distributors, Inc., D.C. S.D.N.Y., 283 F. 219, 222; Drummond v. Altemus, C.C.E.D.Pa., 60 F. 338; cf. Archbold v. Sweet, 172 Eng.Rep. 947; Royle v. Dillingham, 53 Misc. 383, 384, 104 N.Y.S. 783; Lee v. Gibbings, 67 L.T. R. 263; Cox v. Cox, 68 Eng.Rep. 1211, 1214; Annot. Unfair Competition—Art—Literature, 19 A.L.R. 949.

11. See, e.g., Uproar Co. v. National Broadcasting Co., D.C.Mass., 8 F.Supp. 358; Fisher v. Star Co., 231 N.Y. 414, 132 N. E. 133, 19 A.L.R. 937; Estes v. Williams, C.C.S.D.N.Y., 21 F. 189; Royle v. Dillingham, 53 Misc. 383, 104 N.Y.S. 783; cf. Packard v. Fox Film Co., supra.

2. If, on the remand, the evidence should favor the plaintiff, I think we should grant him further relief, i. e., an injunction against publication by the defendant of any truncated version of his work, even if it does not bear plaintiff's name. I would rest the grant of that relief on an interpretation of the contract.

Plaintiff, in asking for such relief, relied in part not on the contract but on the doctrine of artists' "moral right," a compendious label of a "bundle of rights" [12] enforced in many "civil law" countries.[13] Able legal thinkers,[14] pointing out that American courts have already recognized a considerable number of the rights in that "bundle," have urged that our courts use the "moral right" symbol. Those thinkers note that the label "right of privacy" served to bring to the attention of our courts a common center of perspectives previously separated in the decisions,[15] and that the use of that label induced further novel and valuable judicial perspectives.

To this suggestion there are these objections: (a) "Moral right" seems to indicate to some persons something not legal, something meta-legal. (b) The "moral right" doctrine, as applied in some countries, includes very extensive rights which courts in some American jurisdictions are not yet prepared to acknowledge; [16] as a result, the phrase "moral right" seems to have frightened some of those courts to such an extent that they have unduly narrowed artists' rights.[17] (c) Finally, it is not always an unmitigated boon to devise and employ such a common name. As we have said elsewhere: [18] "A new name, a novel label expressive of a new generalization, can have immense consequences. Emerson said, 'Generalization is always a new influx of the divinity into the mind. Hence the thrill that attends it.' Confronted with disturbing variety, we often feel a tension from which a generalization, an abstraction, relieves us. It serves as a de-problemizer, aiding us to pass from an unstable, problematical, situation to a more stable one. It satisfies a craving, meets what Emerson called 'the insatiable demand of harmony in man,' a demand which translates itself into the so-called 'law' of 'the least effort.' But the solution of a problem through the invention of a new generalization is no final solution: The new generalization breeds new problems. Stressing a newly perceived likeness between many particular happenings which had theretofore seemed unlike, it may blind us to continuing unlikenesses. Hypnotized by a label which emphasizes identities, we may be led to ignore differences. * * * For, with its stress on

The unfair competition doctrine has yielded some judge-made monopolies of doubtful value to the public. See, e. g., Standard Brands v. Smidler, 2 Cir., 151 F.2d 34, 38–43; General Time Instrument Corp. v. U. S. Time Corporation, 2 Cir., 165 F.2d 853, 855, dissenting opinion; Triangle Publications v. Rohrlich, 2 Cir., 167 F.2d 969, 980, dissenting opinion; cf. Chafee, Unfair Competition, 53 Harv.L.Rev. (1940) 1289, 1318–19. But the application of that doctrine here is obviously in the public interest.

12. See Rohmer v. Commissioner, 2 Cir., 153 F.2d 61, 63; Standard Oil Co. v. Clark, 2 Cir., 163 F.2d 917, 930–939.

13. See Roeder, Doctrine of Moral Right, 53 Harv.L.Rev. 554, 565–572; Ladas, International Protection of Literary and Artistic Property, Vol. I, 575 et seq.; Katz, Doctrine of Moral Right, 24 So. Cal.L.Rev. 375 (1951).

14. See citations in preceding footnote.

15. Warren and Brandeis, The Law of Privacy, 4 Harv.L.Rev. (1890) 193.

16. See, e.g., Katz, The Doctrine of Moral Right, 24 So.Cal.L.Rev. (1951) 374, 390, 394, 395, 396 and especially 399; Roeder, Moral Right, 53 Harv.L.Rev. (1940) 554, 561, 565.

17. See, e.g., Vargas v. Esquire, 7 Cir., 164 F.2d 522, 526; Crimi v. Rutgers Presbyterian Church, 194 Misc. 570, 89 N.Y.S. 2d 813 (right of a mural painter to enjoin destruction by church of his mural; court held that his was an interest in real estate and distinguishable from interests in literary property); Shostakovich v. Twentieth Century Fox Film Corp., 196 Misc. 67, 80 N.Y.S.2d 575.

18. Guiseppi v. Walling, 2 Cir., 144 F.2d 608, 618–619, 155 A.L.R. 761.

uniformity, an abstraction or generalization tends to become totalitarian in its attitude towards uniqueness." [19]

Without rejecting the doctrine of "moral right," I think that, in the light of the foregoing, we should not rest decision on that doctrine where, as here, it is not necessary to do so.

[19]. There is need to avoid both excessive nominalism and excessive "realism." See Frank, Courts on Trial (1949) 401–404.