### CURWOOD v. AFFILIATED DISTRIBUTORS, Inc., et al.

(District Court, S. D. New York. July 22, 1922.)

1. **Literary property ⬦6—Rights of purchaser of motion picture rights respecting elaboration of story stated.**

   The right to elaborate a story acquired by a purchaser of the motion picture rights includes the right to add scenery, action, and characters, and even supplant subordinate portions of the original story; but the elaborator is under obligation to retain and give appropriate expression to the theme, thought, and main action of the story, and when this is not done the author will be protected by injunction against the use of his name or the name of his story.

2. **Literary property ⬦9—Evidence insufficient to show author gave right to use his name in connection with any pictures produced by purchaser of moving picture rights.**

   Evidence *held* insufficient to show that an author of standing, prestige, and reputation, in selling the motion picture rights for one of his earlier stories, agreed that the purchaser might attach his name to any picture that it saw fit to produce.

In Equity. Suit by James Oliver Curwood against the Affiliated Distributors, Inc., and others. Injunction granted.

See, also (D. C.) 283 Fed. 223, and International Film Service Co. v. Affiliated Distributors (D. C.) 283 Fed. 229.

Nathan Burkan, of New York City, for plaintiff.

Thomas & Friedman, of New York City, for defendants Warner.

Neuman & Newgass, of New York City (Frederick F. Neuman, of New York City, of counsel), for Affiliated Distributors, Inc., and other defendants.

KNOX, District Judge. Plaintiff is the author of some 25 novels and numerous shorter stories. Some of the former, notably "The River's End" and "The Valley of Silent Men," have had a wide distribu-

───────────

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tion, and have brought Mr. Curwood's name into favorable position before the novel-reading public.

In the main, the plots of complainant's fiction are laid in the Canadian Northwest, and frequently have as prominent characters thereof members of the Northwest Mounted Police. Most of the novels have been reproduced in motion pictures. These, too, have met with success, some of them having yielded rentals of more than $500,000. In connection with the exploitation of such pictures, Curwood's name has been prominently advertised and displayed. Unquestionably it is now associated by many moving picture distributors and patrons with stories having to do with forests, streams, snow, ice, and romance as they are, or are imagined to be, in the subarctic regions of this continent. That this association is of value to plaintiff may be indicated by testimony offered herein to the effect that the moving picture rights of one of plaintiff's stories sold for more than $50,000.

Defendants, Affiliated Distributors, Inc., William Nigh, Edwin Carewe Pictures Corporation, Charles C. Burr, and Edwin Carewe were interested in the making and exploitation of a Northwest Mounted Police story which has been given the title "I Am the Law." Appreciating the value of complainant's name, when it was advertised that "I Am the Law" was based on James Oliver Curwood's latest story, "The Poetic Justice of Uko San," defendants set about to acquire the right to so advertise their picture. The means adopted therefor were as follows:

A number of years before he attained his present prominence as an author of fiction, Curwood wrote some stories for the Outing magazine. One of these was entitled "The Poetic Justice of Uko San." The tale had to do with three bears encountered by two men who were hunting in the north woods. Inasmuch as the only resemblance which the scenario and picture of "I Am the Law" bears to "The Poetic Justice of Uko San" is that the action of each takes place in northwestern Canada, there is no need to dwell upon the theme of the latter. When Curwood sold the story to Outing, moving picture rights were not valued as at present, and there is some question as to whether Curwood had retained such rights. At all events, Outing had placed its rights to the story upon the market, and they were in the hands of a literary broker for sale. It appears that such rights, whatever might be their value as moving picture material, were not particularly desirable without the acquiescence of complainant.

Thereupon the defendant Burr entered into negotiation with Curwood's agent, Milligan, for the purchase of such rights. The price demanded by Milligan was $5,000. This figure was too large for Burr, and he declined the same, and then took steps to purchase the rights through the medium of the defendant Nigh. The latter got in touch with a literary broker named Maxine Alton. She in turn took up the matter with Milligan, with the result that upon March 21, 1922, complainant made a contract with Nigh, the important part of which, for present purposes, reads as follows:

"This is to ratify our understanding whereby James Oliver Curwood agrees, upon payment to him * * * of $1,000 and other valuable considerations,

to relinquish all claim or claims he may have or have had in the screen rights to his story Poetic Justice of Uko San, and grants to you his permission, as far as he is concerned, to produce a feature motion picture of five reels or more from said story; it being understood that you are to select a capable man to elaborate on said story, with addition of characters, etc., however needed, and said production to be cast with a selected cast and to be produced in a first-class manner in every respect. * * * It is also understood that should you, either by act or omission, break the terms of the understanding as outlined in this letter, said understanding shall thereupon become null and void, and all moneys which shall have been paid to Mr. Curwood, and whatever benefit may have been derived by him under the terms of this letter, shall be retained by him without let or hindrance as liquidated damages, and from thenceforth shall become his sole and undisputed property. * * *"

The gist of Curwood's complaint is that, while Nigh was accorded the right to "elaborate" upon the story and reproduce it in moving pictures, he was not given the privilege to utterly disregard the same and yet use its name, and Curwood's authorship thereof, in connection with a wholly different story and picturization. It is claimed that what defendants have done, in advertising and producing their picture "I Am the Law" as being based upon Curwood's story "The Poetic Justice of Uko San," injures his standing, reputation, and prestige, and is in derogation of his civil rights, and, further, that the picture "I Am the Law" is a piratical adaptation of complainant's stories, "The River's End" and "The Valley of Silent Men."

Defendants admit the production of their picture, and also that the same is advertised in the manner complained of. It is, however, denied that plaintiff's stories, last mentioned, are pirated and plagiarized, and it is asserted, by way of defense, that Nigh's only purpose in buying the rights to "The Poetic Justice of Uko San" was to acquire authority to use Curwood's name in such picture as he, or his assignees, might choose to produce; that such purpose was thoroughly understood by Curwood, and that as a matter of fact, the picture "I Am the Law" has been artistically produced by a selected cast; and, this having been done, complainant is in no position to object.

Much testimony has been offered by defendants in an effort to show, not only that Curwood was willing to sell his name, reputation, and prestige for hardly more than a nominal sum, but also that such practice is a common one among authors of repute. It is said that Milligan, Curwood's agent, was flatly told by Miss Alton and by Burr that only the right to use Curwood's name was desired. Indeed, from defendants' evidence, it is charged that Curwood himself had previously negotiated for the sale of his name, in connection with stories not his own. Upon being asked why, if this were true, the real purpose of Nigh was not set forth in the contract, the witnesses giving the testimony just referred to replied that to pursue such course "wouldn't look nice."

Milligan and Curwood deny that any such statement of Nigh's purpose was communicated to them, or that they suspected the same. As to the denial of Curwood, covering prior negotiations with Burr, I may say that it impressed me as being earnest and sincere, and had about it a tone of indignation that I believe not to have been feigned. He said:

"Mr. Burr and I did have a conversation in his office regarding the sale of stories, in which he made the proposition to me of selling the use of my name, and that he would have another individual write a story to be exploited under my name. * * * The date I cannot remember, but I was in New York, and at the time Mr. Milligan was with me. * * * It was at a time when Mr. Burr was considering 'Little Miss "Tired-of-it-all," ' 'A Nice Quiet Time,' 'The Governor's Daughter,' and 'The Yellow Back.' * * * Mr. Burr objected to the prices of these stories, and, while I cannot remember all the conversation had, I do remember one part of it very definitely, in which he said to me, 'Mr. Curwood, can you not give us something that we can use, so that we can put your name on a story, and we will have a story written up?' And I said, 'No.' I said that no reputable author would prostitute his work in that way, because he could not be paid enough money to repay him for prostituting his work in that way, because sooner or later it would get out, and, even if it did not get out, no reputable writer that I know of would defraud the public in that way. Then he brought up—and that was the only time that he brought it before me—the question of these stories, which for three years, your honor, I had been trying hard to keep from being produced. Those stories—there were four of them—were 'The Coyote,' 'Uko San,' 'A Poor Man's Chance,' and 'Test of a Code.' * * * We were hounded into the sale of these stories by the Alton Play Bureau and other interests. * * * I told Mr. Burr at that time positively that he could not use any of those stories. And Miss Alton, I do not see how she can forget the fact, because I was very angry at the time; * * * once I talked with her and with a gentleman who was there. * * * I told them the situation, * * * that it would be a fraud to put those stories out before the public, that I would not allow them to be put on, and that I would sue."

Much more to the same effect might be quoted, but it is unnecessary, inasmuch as I believe that complainant did not contract for the mere sale of his name.

It is argued that "The Poetic Justice of Uko San" does not contain the elements upon which a five-reel "feature" picture might be founded, and that this tends to establish defendants' contention. As to this, there is conflicting testimony. Carewe, a successful moving picture director, says that the story is devoid of elements which would permit its elaboration into a feature picture. His testimony possesses no little weight. He is corroborated by Burr and others. Curwood, on the contrary, says that "Uko San" offers all the elements for a good animal picture of the emotional nature. He cites what was done with his story "Nomads of the North," the chief characters of which were a bear and a dog. I have concluded that an elaboration of "The Poetic Justice of Uko San" into a five-reel feature was not impossible. It is to be admitted that the task to a layman would seem difficult, but I do not consider it beyond the range of possibility in the hands of a person of skill and imagination.

[1] And now as to what is acquired when one procures the right to elaborate upon an original story. Upon this much need not be said. I take it that, while scenery, action, and characters may be added to an original story, and even supplant subordinate portions thereof, there is an obligation upon the elaborator to retain and give appropriate expression to the theme, thought, and main action of that which was originally written. The unqualified grant of this right is, I should say, fraught with danger to a writer of standing, particularly when he inserts no provision for his approval of such elaboration as may be made. Nevertheless, elaboration of a story means something other

than that the same should be discarded, and its title and authorship applied to a wholly dissimilar tale.

[2] Aside from all this, however, it does not seem probable that Curwood would risk his standing, prestige, and reputation as an author by the sale of his name for attachment to any picture that a purchaser might see fit to produce, and all this for $1,000. He is yet a young man; he has achieved success; he has reason to hope for much more, and upon the evidence before me I am wholly unable to believe that he would jeopardize it all, and sell his birthright for a proverbial mess of pottage. I will protect him by injunction against the present use of the name of "The Poetic Justice of Uko San," and his authorship thereof, in connection with the picture entitled "I Am the Law."

The question of damages sought by plaintiff against the defendants, together with his allegation that the picture "I Am the Law" infringes upon the copyright of "River's End," is reserved for further consideration.

⚜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes