ALFRED D. CRIMI, Plaintiff, *v.* RUTGERS PRESBYTERIAN CHURCH IN THE CITY OF NEW YORK, Defendant.

Supreme Court, New York County, January 29, 1949.

*Milton A. Morrison* and *Sol Rosenbluth* for plaintiff.

*Nicholas M. Selinka* and *Paul G. Reilly* for defendant.

CHARLES C. LOCKWOOD, Official Referee. In 1937 the Rutgers Presbyterian Church invited members of the National Society of Mural Painters to enter a competition to design and execute a mural to be placed on the rear chancel wall of its edifice on West Seventy-third Street, Manhattan.

Some twenty artists competed, and after study the committee in charge unanimously selected the plans and sketches of the well-known Alfred D. Crimi for a fresco mural painting twenty-six feet wide by thirty-five feet high.

A contract in which the church is designated as " Owner " and Mr. Crimi as " Artist " was prepared by the attorney for the church and the attorney for Mr. Crimi, and signed by the chairman of the board of trustees of the church and by the artist on February 4, 1938.

The work was completed in time, as per contract, and the agreed price of $6,800 paid in full.

The manner in which the work was done is described by Mr. Crimi as follows: " the fresco had to be built over the

existing wall which had a metal lath base suspended four inches over the brick structure on steel channels running perpendicularly. Holes were cut through the wall and the existing channels were re-inforced in order that they could carry the weight of the new structure. New channels were then fastened horizontally over the existing ones and in turn were furred with metal lath over which the plaster was laid. To avoid contact between the new and existing wall, after the holes were replastered, a heavy coat of asphalt was applied over the old. This also served as water-proofing, eliminating the possibility of dampness penetrating through the brick structure.

"Fresco painting is done on wet plaster. The color adheres to the plaster through chemical action — the union of carbonic acid gas and lime oxide producing carbonate of lime as the water evaporates on the surface of the plaster. In fresco no binding agent need be mixed with the pigment as in other painting processes; the pigments are simply well ground in water and applied to the wet surface. As the plaster dries, the color is actually incorporated in the plaster and — if the work is properly executed — the painting is assured a permanence surpassing that achieved in any other method of wall decoration."

The contract provides that the executed fresco mural, as soon as affixed to the chancel wall, would become a part of the church building. Also that the work of the artist was to be copyrighted and such copyright duly and properly assigned to the owner — the church. This was done.

The mural, signed by the artist, was dedicated November 20, 1938. At the service a leaflet was distributed to the congregation, reading in part: "Thus the desires and hopes and the thoughtful study, over a period of twelve years, of a difficult aesthetic and deeply religious problem comes to consummation on this twentieth day of November, 1938. Whether the committee and the artist have done well is not for them to say. They have done their best. The verdict must be left to the present congregation, to the successive generations of worshippers who will look upon the fresco, and to Him whose glory is all in all. * * * With the passage of time the mural will grow less brilliant but richer in color."

Plaintiff says that the Reverend Ralph W. Key, former pastor of the church, told him that some parishioners objected to the mural, feeling that a portrayal of Christ with so much of His chest bare placed more emphasis on His physical attributes than on His spiritual qualities.

The number of those objecting evidently increased, for in 1946, when the church was redecorated, the mural was painted over without first giving notice to plaintiff.

Upon learning what had been done, plaintiff brought this proceeding, alleging three causes of action for equitable relief:

(1) To compel the defendant to remove the obliterating paints on the fresco mural.

(2) In the alternative, to permit the plaintiff to take the fresco mural from the defendant's church at the cost and expense of the defendant.

(3) In the event that the fresco mural cannot be thus removed, for judgment against the defendant for $50,000 on each of the three alleged causes of action.

Defendant has denied plaintiff's requests that the obliterations be removed or that he be given the right to take away the mural.

Plaintiff contends that "Defendant's obliteration of the mural constituted a breach of the custom and usage considered part of the contract of commission; violates plaintiff's continued, albeit limited, proprietary interest therein; constitutes irreparable damage to plaintiff; and constitutes an anti-social act and one against public policy."

Defendant asserts:

(a) That the mural, under the terms of the contract, became part of the building owned by the church.

(b) That the church is not a public or semipublic building.

(c) That the contract between an artist and his patron is basically and essentially a service contract.

(d) That when the artistic work has been completed and delivered to the patron and accepted and paid for by the patron there is no right whatever in and to the subject matter of the painting reserved to the artist in the absence of a specific agreement providing therefor.

(e) That the contract here contains no such reservation.

Thus, the question presented is whether the sale by an artist of a work of art wipes out any interest he might have therein.

Certain general customs and usages are claimed between artists and those who contract with them for the creation of a work to which the artist's name and reputation will be attached — more specifically between mural artists and public or semi-public institutions open to the public. The gist of this claimed custom is that the work, if accepted as being of high artistic standard, will not be altered, mutilated, obliterated or destroyed.

The existence of these customs and usages, their universality,

and their acceptance by the public was testified to by leading artists, art critics and art experts.

Plaintiff also pleads that, aside from the question of custom and usage, the artist has a continued limited proprietary interest in his work after its sale, to the extent reasonably necessary to the protection of his honor and reputation as an artist, and that within this limited ambit of protection was the right to have the work continue without destruction, mutilation, obliteration or alteration.

The fact that artists, as distinguished from artisans and mechanics, have peculiar and distinctive rights in their work has been accepted in some countries of the continent of Europe, where it has been given the appellation " droit moral " (see The International Protection of Literary and Artistic Property, by Stephen P. Ladas, [1938 ed.]).

The extent to which such doctrine has been adopted in common-law jurisdictions is considered by Martin A. Roeder in Harvard Law Review (Vol. 53, p. 554), The Doctrine of Moral Right: A study in the Law of Artists, Authors and Creators, in which (p. 557) the author distinguishes the protection provided by the copyright laws from that provided by the " droit moral ".

" When an artist creates, be he an author, a painter, a sculptor, an architect or a musician, he does more than bring into the world a unique object having only exploitive possibilities; he projects into the world part of his personality and subjects it to the ravages of public use. There are possibilities of injury to the creator other than merely economic ones * * *. Nor is the interest of society in the integrity of its cultural heritage protected by the copyright statute."

However, this author, discussing the Bern Convention as revised at Rome in 1928, says, at page 569 of his article: " The right to prevent deformation does not include the right to prevent destruction of a created work. The doctrine of moral right finds one social basis in the need of the creator for protection of his honor and reputation. To deform his work is to present him to the public as the creator of a work not his own, and thus make him subject to criticism for work he has not done; the destruction of his work does not have this result. Thus even in France, in *Lacasse et Welcome c. Abbé Quénard* [*Cour de Paris,* April 27, 1934, D. H. 1934. p. 385], it was held that the artist could not recover when murals painted by him on the walls of a church were destroyed, without notice, by the abbé."

The article 6 of the Bern Convention, the International Copyright Union, reads:

" (1) Independently of the patrimonial rights of the author, and even after the assignment of the said rights, the author retains the right to claim the paternity of the work, as well as the right to object to every deformation, mutilation or other modification of the said work, which may be prejudicial to his honor or to his reputation.

" (2) It is left to the national legislation of each of the countries of the Union to establish the conditions for the exercise of these rights. The means for safeguarding them shall be regulated by the legislation of the country where protection is claimed."

The United States of America was not a signatory to these conventions held at Bern and Rome.

Plaintiff concedes " there is a decided paucity of legal authority " on the question in this country. He quotes from Stephen P. Ladas' work (1 The International Protection of Literary and Artistic Property, § 287, p. 603): " The author may demand respect for the integrity of his work. This applies only to cases in which his work has been presented to the public. It does not extend to the personal or private use of a reproduction of his work by the purchaser thereof, but it does when the original work of the author is involved. This is particularly the case with works of art, the nature of which calls for exhibition by the purchaser. The latter is not permitted to violate its integrity; but is he permitted to destroy the work of art? A decision of the Court of Appeals of Paris has recognized the right of the purchaser of a work of art to destroy it. While this may be justified on a strict interpretation of the legal position based on the general law of property, it is questionable whether it should be admitted in the case of works of art. *Modern legislation and court decisions have admitted several limitations of the property right in cases where public or social interests are involved. The maintenance and preservation of a work of art is invested with the public interest in culture and the development of the arts.*" (Italics supplied.)

In a footnote Ladas cites *Lacasse et Welcome c. Abbé Quénard*, " reported in Dalloz, 1934, p. 385 ", where " The Court reversed the decision of the Tribunal Civil de Versailles and held that the proprietor of a church containing wall paintings may destroy the latter without advising the artist and permitting him to remove them." The author severely criticizes this holding in the language italicized above.

Ladas cites Nicola Stolfi and Hermann Otavsky (foreign authors) for the proposition that the owner may not destroy a work of art because of the " intention of the parties at the time of purchase, and   *   *   *   claims that such intention is limited to the transfer of the work for the purpose of its being used according to its nature, and not for the purpose of destruction." (Ladas, *op. cit. supra*, p. 604.)   Thus Ladas, Stolfi and Otavsky are all in agreement that the owner should not have the right to destroy the work of art, Ladas on the ground of public policy and Stolfi and Otavsky on the ground of original intent of the parties.

Counsel overlooked the statement at page 802 (Vol. 2, § 367) where Ladas writes: " The conception of ' moral right ' of authors, so fully recognized and developed in the civil-law countries, has *not yet received acceptance in the law of the United States. No such right is referred to by legislation, court decisions or writers.*" (Italics supplied.)

This comment is supported by *Vargas* v. *Esquire, Inc.* (164 F. 2d 522, 526), where the court said:

" ' The conception of " moral rights " of authors so fully recognized and developed in the civil law countries has not yet received acceptance in the law of the United States. No such right is referred to by legislation, court decision or writers.'

" What plaintiff in reality seeks is a change in the law in this country to conform to that of certain other countries. We need not stop to inquire whether such a change, if desirable, is a matter for the legislative or judicial branch of the government; in any event, we are not disposed to make any new law in this respect."

And by *Yardley* v. *Houghton Mifflin Co.* (25 F. Supp. 361, affd. 108 F. 2d 28):

" When a man, hereinafter referred to as a patron, contracts with an artist to paint a picture for him, of whatever nature it may be, the contract is essentially a service contract, and when the picture has been painted and delivered to the patron and paid for by him, the artist has no right whatever left in it.

" Whilst the artist in such a case may by contract reserve the right of reproduction, and so reserve his right of copyright, *Werckmeister* v. *Springer Lithographing Co., C. C.,* 63 F. 808, 809, if the sale is not shown to have been thus limited, the patron becomes the sole owner and has all the rights in the picture, including the right to reproduce it, and the artist employed to make the picture cannot derogate from his patron's rights by taking out a copyright thereon without his patron's permission."

In *Pushman* v. *New York Graphic Soc.* (25 N. Y. S. 2d 32, 34) Mr. Justice O'BRIEN, at Special Term, said: " In this case the absolute sale and delivery of the painting without any condition, reservation or qualification of any kind, to a state-owned public institution where it has been displayed for a long period of time, constitute an abandonment of all the plaintiff's rights and a  *  *  *  dedication to public use free for enjoyment and reproduction of anybody."

Our Court of Appeals, affirming (287 N. Y. 302, 308), in a unanimous decision by DESMOND, J., stated in part: " Our conclusion is that under the cases and the texts, this unconditional sale carried with it the transfer of the common law copyright and right to reproduce. Plaintiff took no steps to withhold or control that right. ' The Courts cannot read words of limitation into a transfer which the parties do not choose to use ' (*Dam* v. *Kirk La Shelle Co.*, 175 Fed. Rep., 902, 904)."

Thus, the claim of this plaintiff that an artist retains rights in his work after it has been unconditionally sold where such rights are related to the protection of his artistic reputation, is not supported by the decisions of our courts.

This court does not agree with the contention that the destruction of the mural to which plaintiff's name had been publicly attached constitutes a " body blow " to plaintiff's artistic reputation. It merely shows that those representing the 1938 congregation of this church thought highly of the fresco mural, while those representing the 1946 congregation did not like it.

The cases cited involving literary productions — authors of plays, attempts to restrain modifications of paintings in public or semipublic buildings, and the maintenance and preservation of works of art presented to public authorities — are not in point.

In *Trustees of First Baptist Church of Ithaca* v. *Bigelow* (16 Wend. 28) the court held that the interest of a party in a pew in a church, although a limited and qualified interest, is an interest in real estate, and the sale thereof necessitates a writing.

Plaintiff designed and executed this fresco mural as part and parcel of the wall of the church building — on part of the real estate.

Thus, any interest, proprietary or otherwise, claimed to have arisen by custom and usage as part of the contract of commission, or in any manner, would have to be in writing, or it would violate section 242 of the Real Property Law.

The time for the artist to have reserved any rights was when he and his attorney participated in the drawing of the contract

with the church. No rights in the fresco mural were reserved, and, by the terms of the written agreement between the parties, signed February 4, 1938, the artist plaintiff sold and transferred to defendant all his right, title and interest in the mural.

Judgment for defendant. Submit proposed judgment on five days' notice.

This action was referred to hear and determine January 3, 1949. Trial held January 10th and 11th.