VÍCTOR OSSORIO RUIZ, demandante y recurrente, *v.* JOSÉ H. GRAU, SECRETARIO DE LA VIVIENDA ET AL., demandados y recurridos.

*Número:* R-76-368          *Resuelto:* 20 de mayo de 1977

50

*Gabriel García Maya,* abogado de la Corporación de Servicios Legales de Puerto Rico, abogado del recurrente; *Mario O. García Quintero,* abogado de la codemandada Nereida Falto de Cole.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

La Corporación de Renovación Urbana y Vivienda contrató al recurrente para la creación de ciertos murales en varios edificios residenciales públicos. Al entender tiempo después de terminar su obra que la Corporación estaba modificando la misma, el artista solicitó la expedición de un interdicto para prohibir su alteración o destrucción sin su consentimiento. El tribunal de instancia se negó a expedir el auto.

El caso plantea vitales cuestiones sobre la protección de la propiedad intelectual en Puerto Rico.

En *Reynal* v. *Tribunal Superior,* 102 D.P.R. 260 (1974), resolvimos que la legislación estadounidense no es la única fuente de amparo para la propiedad intelectual. Este principio es aún más evidente aquí. La legislación norteamericana referente a *copyright* se encamina a proteger la explotación económica de una obra. La doctrina civilista del derecho moral va más lejos, habiéndose diseñado para escudar las obras artísticas y literarias y a sus creadores contra daños no económicos. Roeder, M. A., *The Doctrine of Moral Right: a Study in the Law of Artists, Authors and Creators,* 53 Harv. L. Rev. 554, 557 (1940); *Gilliam* v. *American Broadcasting Companies, Inc.,* 538 F.2d 14, 24 (2d Cir. 1976). La doctrina del derecho moral se remonta a tiempos romanos. Dock, Marie-Claude, *Etude sur le Droit d'Auteur,* Paris, 1963, pág. 34 *et seq.* La legislación federal sobre derechos de autor no desplaza la doctrina del derecho moral. Se trata de conceptos diferentes, sin conflicto entre ellos.

■ La propiedad intelectual posee rasgos muy singulares que la distinguen de otros géneros de bienes. Representa un haz de derechos distintos, agrupables en dos categorías: los derechos pecuniarios o patrimoniales que atañen la enajenación de la obra y los derechos personales o extrapatrimoniales que defienden su integridad y el nombre y honra de su autor, facultades que dan pie a la referida doctrina del derecho moral. Castán, *Derecho Civil Español, Común y Foral*, tomo I, vol. II, 11ª ed. 1971, págs. 365–366; Ladas, *The International Protection of Literary and Artistic Property*, vol. I, N.Y. 1938, págs. 575–578; Kayser, *Les Droits de la personnalité*, 1971 Revue trimestrelle de droit civil 445, 473 (1971).

■ La doctrina del derecho moral del autor se reconoce en España desde hace considerable tiempo, a pesar de que el texto de la ley más reciente sobre la propiedad intelectual, aprobada el 10 de enero de 1879, no es del todo explícito sobre el tema. Scaevola, *Código Civil*, tomo VII, 4ª ed. 1943, pág. 569 *et seq.* Castán de hecho apoya que "el derecho moral de los autores halle consagración expresa en una nueva ley de Propiedad Intelectual . . . ." Castán, *op. cit.*, 367. Respecto a la fuente legal de este derecho en Puerto Rico, valga señalar que el Art. 56 de la referida ley española de 1879 la hizo específicamente aplicable a Puerto Rico.[1] Giménez Bayo y Rodríguez-Arias Bustamante, *La Propiedad Intelectual*, Madrid, 1949, pág. 333 (se incluye en este libro el texto de la ley). En virtud del Art. 8 de la Ley Foraker y del Art. 58 de la Ley de Relaciones Federales dicha legislación continuó vigente en el país bajo las condiciones que allí se especifican. La antigua legislación española y los Arts. 12 y 7 de nuestro Código Civil ofrecen amplio fundamento para el reconocimiento en Puerto Rico del derecho moral de los autores, creadores y artistas. Castán, *op. cit.*, tomo II, vol. I, 10ª ed. 1971,

---

[1] La ley entró en vigor en la Isla en virtud del Real Decreto de 10 de enero de 1879. Su vigencia no depende del Código Civil que entró en vigor diez años más tarde en virtud del Real Decreto de 31 de julio de 1889.

págs. 416–418. Base adicional la ofrece la Convención Universal sobre Derecho de Autor de 6 de setiembre de 1952, de la cual es signatario Estados Unidos. 6 U.S.T. 2731, T.I.A.S. 3324. Según la ley española de 1879, la propiedad intelectual comprende las obras científicas, literarias y artísticas que pueden darse a la luz por cualquier medio. Montero y Martínez, T., *Propiedad Intelectual*, La Habana, 1951, pág. 13 *et seq.* y 66 *et seq.* Véase: Duchemin, J. L., *Le Droit de Suite des Artistes*, Paris, 1948, pág. 69.

■ En el derecho civil se le reconoce particular preeminencia al derecho moral de un artista a que se respete el producto de su actividad creadora. Espín, *Derecho Civil Español*, vol. II, 4ª ed., 1974, pág. 299 *et seq.*; Puig Brutau, *Fundamentos de Derecho Civil*, tomo III, vol. II, 2ª ed. 1973, pág. 213; Manresa, *Código Civil Español*, tomo III, 7ª ed. 1952, pág. 846 *et seq.*; Giménez Bayo y Rodríguez-Arias Bustamante, *La Propiedad Intelectual*, Madrid, 1949, pág. 16 *et seq.*, Planiol y Ripert, *Derecho Civil Francés*, tomo III, Habana, 1942, págs. 499–500; Monta, *The Concept of "Copyright" versus the "Droit d'Auteur"*, 32 So. Cal. L. Rev. 177, 179 (1959); Strauss, *The Moral Right of the Author*, 4 Am. J. Comp. L. 506, 507–514 (1955); Katz, *The Doctrine of Moral Right and American Copyright Law—A Proposal*, 24 So. Cal. L. Rev. 375 (1951); Marty et Raynaud, *Droit Civil*, 2ᵉᵐᵉ ed., tomo II, vol. II; Sirey, 1961, pág. 428.

■ La doctrina del derecho moral comprende en su ámbito, entre otras facultades, "el derecho de defensa de la integridad de la obra, que en su aspecto positivo le autoriza para modificarla, y en el negativo para impedir que sea alterada o deformada por los demás." Castán, *op. cit.*, 366. Desbois, H., *Le Droit d'Auteur en France*, 2ᵉᵐᵉ ed., Dalloz, 1966, pág. 483; Plaisant, R., *Le Droit des Auteurs et des Artistes Exécutants*, Paris, 1970, pág. 66; Fabiani, M., *Il Diritto d'Autore nella Giurisprudenza*, 2ª ed., Padova, 1972, pág. 57.

54

■ Fuera de España se le ha reconocido contenido análogo a la doctrina del derecho moral. En el Convenio Internacional de Berna de 1885, revisado en Berlín en 1908, en Roma en 1928 y en Bruselas en 1948, se expresa en el Art. 6 *bis* (1):

"(1) Independientemente de los derechos patrimoniales del autor, y lo mismo después de la cesión de dichos derechos, el autor conserva el derecho de reivindicar la paternidad de la obra, así como el derecho a oponerse a toda deformación, mutilación u otra modificación de dicha obra, que fuere perjudicial a su honor o a su reputación."

Véase: Giménez Bayo y Rodríguez-Arias Bustamante, *op. cit.*, 345; Encyclopédie Dalloz, *Repertoire de Droit Civil*, 2$^{eme}$ ed., 1967, "Propriété Litteraire et Artistique", par. 397 *et seq.;* Desbois, *loc. cit.;* Fabiani, *loc. cit.;* Moreira da Silva, M., *Código do Direito de Autor*, Coimbra, 1966, pág. 119; Ionascu, Comsa y Muresan, *Dreptul de Autor*, Bucuresti, 1969, pág. 25. La Declaración Universal de los Derechos del Hombre también reconoce la doctrina del derecho moral. Art. 27(a). El derecho a evitar la deformación de una obra se ha reconocido en la jurisprudencia y la doctrina angloamericana. Roeder, *The Doctrine of Moral Right: a Study in the Law of Artists, Authors and Creators*, 53 Harv. L. Rev. 554, 565–572 (1940); Yankwich, *Unfair Competition as an Aid to Equity in Patent, Copyright and Trade-mark Cases*, 32 Notre Dame Law. [*sic*] 438, 464 (1957); *Gilliam* v. *American Broadcasting Co., Inc.*, supra, pág. 24; *Prouty* v. *National Broadcasting Co.*, 26 F.Supp. 265 (D.C. Mass. 1939); *Gordella* v. *Log Cabin Products, Inc.*, 89 F.2d 891 (2d Cir. 1937); *Packard* v. *Fox Film Corp.*, 202 N.Y. Supp. 164 (1923); *Curwood* v. *Affiliated Distributors, Inc.*, 283 Fed. 219 (S.D.N.Y. 1922); *De Bekker* v. *Stokes*, 153 N.Y. Supp. 1066 (1915); *Royle* v. *Dillingham*, 104 N.Y. Supp. 783 (1907); *Drummond* v. *Altemus*, 60 Fed. 338 (E.D. Pa. 1894).

El derecho moral nace con la obra misma y subsiste, conforme a varios comentaristas, aun después de su cesión. Puig Brutau, *op. cit.*, tomo II, vol. I, 10ª ed. 1971, págs. 423–425; Manresa, *op. cit.*, 865–866; Espín, *op. cit.*, 311; Giménez Bayo y Rodríguez-Arias Bustamante, *op. cit.*, 255 *et seq.; cf.* Whicher, *The Creative Arts and the Judicial Process*, N.Y. 1965, pág. 12. Aun en ausencia total de legislación se ha sostenido la aplicabilidad de la doctrina. Monta, *op. cit.*, 178. La obra de un artista es de hecho una prolongación de su personalidad. Dalloz, *op. cit.*, "Biens" par. 491 (1967). Un atentado contra la obra lesiona la personalidad y dignidad de su creador. (²) De ahí que algunos comentaristas hayan catalogado el derecho moral como un derecho "absoluto, no evaluable en dinero, inalienable e intransmisible, e imprescriptible." Castán, *Derecho Civil Español, Común y Foral*, tomo 1, vol. 2, 11ª ed. 1971, pág. 366; Ladas, *The International Protection of Literary and Artistic Property*, Vol. I, N.Y., 1938, págs. 578–579 y 600–601. Se ha sostenido específicamente que la condición de empleado del artista no le priva de su derecho a la propiedad intelectual. Desbois, *op. cit., mise en jour* 1973, pág. 14.

La doctrina del derecho moral se ha aplicado específicamente para evitar la modificación de murales. Roeder, *op. cit.*, 554, n. 2; Dalloz, *op. cit.*, "Propriété Litteraire et Artistique", par. 405 (1976).

La precisión de los contornos del derecho moral de autores y artistas exige, no obstante, que examinemos con mayor detenimiento la naturaleza de la propiedad intelectual. Su singular y complicado carácter ha provocado en ocasiones interpretaciones extremas de que debemos cuidarnos. Algunos

---

(²) Adviértase la tangencia con la disposición del Art. II, Sec. 1, de la Constitución de Puerto Rico, en que se proclama que la dignidad del ser humano es inviolable. La vigencia de esta declaración no depende de la aprobación de ley alguna. *Alberio Quiñones* v. *E.L.A.*, 90 D.P.R. 812, 816 (1964); *González* v. *Ramírez Cuerda*, 88 D.P.R. 125, 133 (1963).

56

comentaristas concentran exclusiva o preferentemente en la faceta patrimonial de la propiedad intelectual y se esfuerzan en sujetarla al típico derecho de bienes, con el resultado de que se lesiona severamente el derecho moral. Otros comentaristas llegan al polo opuesto al realzar el elemento extrapatrimonial en detrimento de otros intereses individuales y sociales. Favorecemos un tercer enfoque, el ecléctico, que reconoce la índole polifacética de la propiedad intelectual e intenta armonizar los intereses en potencial conflicto. Espín, *Derecho Civil Español*, vol. II, 4ª ed., 1974, pág. 282.

■ Conforme a este último enfoque, no puede concebirse el derecho moral como un derecho absoluto. Debe reconciliársele con otros intereses individuales y de la comunidad. Cada caso deberá examinarse a la luz de sus propios hechos. Ladas, *op. cit.*, pág. 579; Fisher, *Studies on Copyright*, Vol. II, Fred B. Rothman Co., N.J. 1963, págs. 123-125; Desbois, *Le Droit d'Auteur en France*, 2ᵉᵐᵉ ed., Dalloz, 1966, pág. 483. De todos modos, el artista no puede ejercer su derecho de modo abusivo. El ejercicio del derecho moral está sujeto a la doctrina del abuso de derecho. Plaisant, *Le Droit des Auteurs et des Artistes Exécutants*, Paris, 1970, pág. 60 *et seq.*; Desbois, *op. cit.*, 484-485; *Novissimo Digesto Italiano*, vol. V, Ed. Torinese, 1960, "Diritti d'Autore", 695-696.

El interés público puede dictar, por ejemplo, en determinadas circunstancias la destrucción de un edificio. La existencia en él de un mural no puede impedir dicha acción.(³) Sostener que existe un derecho irrestricto a impedirla es caer en los excesos de la teoría personal o extrapatrimonial.

Por lo contrario, argumentar, como se ha argumentado aquí, que la adquisición de una obra de arte le concede a su

---

(³) De ser removible, el artista podría requerir que se le permitiese hacerlo bajo las condiciones que el tribunal estime razonables. Recuérdense, además, los poderes del Instituto de Cultura Puertorriqueña para la conservación de los valores culturales del pueblo de Puerto Rico. Ley Núm. 89 de 21 de junio de 1955, 18 L.P.R.A. sec. 1195 *et seq.*

propietario el derecho a hacer de ella lo que se le antoje equivale a adoptar la antigua teoría patrimonial y a abolir el derecho de todo artista a que se respete el producto de su actividad creadora.

En el caso de autos la Corporación de Renovación Urbana y Vivienda interesa aparentemente restaurar y retocar los murales pintados por el recurrente. Consideramos que, de ser tal la circunstancia, debe asistirle derecho a la referida Corporación a conservar su propiedad en el debido grado de frescura y limpieza. En lo que no tiene razón es en proceder a hacer los retoques o cambios necesarios sin el consentimiento del pintor, con las condiciones ya apuntadas, quien tiene derecho a su vez a velar por la integridad de su criatura artística. Puede lograrse la necesaria armonía en este caso mediante el ofrecimiento al autor de la oportunidad de ejecutar la obra. Si las condiciones económicas o de otra índole que éste quisiese imponer fuesen inaceptables a la Corporación, el tribunal puede fijar las que estime razonables a la luz de la prueba que se ofrezca, e incluso limitarlas a las que la Corporación les haya estado ofreciendo en contrato *bona fide* a otras personas competentes. La doctrina del derecho moral se ha diseñado para proteger intereses extrapatrimoniales y no puramente económicos. El artista no puede hacer demandas irrazonables.

Los derechos extrapatrimoniales del género discutido pueden limitarse por legislación o tratado. Véase el Art. 6 de la ley española de 1879, Giménez Bayo y Rodríguez-Arias Bustamante, *op. cit.*, 287 *et seq.*, y el Art. 4 de la Convención Universal sobre Derecho de Autor, 6 U.S.T. 2731, 2736 y 2737. El problema de la duración del derecho moral no se plantea aquí, lo que hace innecesaria su discusión en detalle.

Por las consideraciones expuestas, *se revoca la sentencia de que se recurre y se devuelve el caso al tribunal de instancia para procedimientos ulteriores consistentes con esta opinión. Se reinstala mientras tanto la orden de entredicho provisional*

58

*dictada por el Tribunal Superior contra la Corporación de Renovación Urbana y Vivienda el 29 de abril de 1976.*

El Juez Asociado Señor Martín disiente en opinión separada. El Juez Asociado Señor Negrón García emitió opinión concurrente en parte y disidente en parte.

—o—

Opinión disidente emitida por el Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 20 de mayo de 1977

El "derecho moral" del artista no está protegido constitucionalmente en Puerto Rico ni tampoco por ley alguna. Al producirse el cambio de soberanía en Puerto Rico en 1898 regía aquí la Ley de Propiedad Intelectual de España de 10 de enero de 1879, que fue incorporada por referencia al Código Civil Español, a través de los Arts. 428 y 429, (¹) al promulgarse éste en 24 de julio de 1889. (²) Pero, al revisarse el Código Civil en Puerto Rico por la Comisión Codificadora en 1902 se eliminaron los Arts. 428 y 429 que hacían referencia a la Ley de Propiedad Intelectual española de 1879, R.C. Núm. 5 de 1°. de marzo de 1902, Estatutos Revisados y Códigos de Puerto Rico de 1902, quedando por tanto nuestra jurisdicción bajo la protección que ofrecía la legislación federal

---

(¹) Art. 428. "El autor de una obra literaria, científica o artística, tiene el derecho de explotarla y disponer de ella a su voluntad." *Código Civil Español*, Dionisio Doblado, 1889, 2da. ed. Madrid.

Art. 429. "La ley sobre propiedad intelectual determina las personas a quienes pertenece ese derecho, la forma de su ejercicio y el tiempo de su duración. En casos no previstos ni resueltos por dicha ley especial se aplicarán las reglas generales establecidas en este Código sobre la propiedad." *Ibíd.*

(²) La vigencia de la Ley de Propiedad Intelectual de 1879 y del Código Civil Español en Puerto Rico se´produjo por virtud del Real Decreto de 31 de julio de 1889. Véanse *Rodríguez* v. *San Miguel et al.,* 4 D.P.R. 105, 114 (1903); *Torres et al.* v. *Rubianes et al.,* 20 D.P.R. 337, 345 (1914).

aplicable a esa materia. (³) Carta Orgánica de 1900, Ley de 12 de abril de 1900, cap. 191, sec. 8, 31 Stat. 79.

En los Estados Unidos, donde no se ha reconocido el derecho del artista, se ha resuelto que el artista no retiene ningún derecho relacionado con la protección de su reputación artística cuando aquél ha vendido incondicionalmente su obra. *Crimi* v. *Rutgers Presbyterian Church*, 194 Misc. 570, 89 N.Y.S.2d 813 (Sup. Ct. 1949); *Vargas* v. *Esquire, Inc.*, 174 F.2d 522 (7th Cir. 1947), véase Merryman, J. H., *The Refrigerator of Bernard Buffet*, 27 Hastings L.J., págs. 1035–39. Es muy poco lo que puede hacer un artista en los Estados Unidos si no ha impuesto al adquirente de su obra una obligación contractual para asegurarse que su paternidad sea reconocida y su obra respetada. Treece, *American Law Analogues of Author's "Moral Right"*, 16 Am. J. Comp. L. 487, 501 (1968).

En gran número de países de Europa, Sur y Centro América existe legislación que protege la propiedad intelectual. Merryman, *op. cit.*, supra, págs. 1023, 1036–37 (1976). En Francia, sin embargo, el derecho moral del artista tuvo un origen judicial y fue desenvolviéndose poco a poco a través de decisiones de los tribunales desde mediados del siglo pasado. No fue hasta 1957 que las normas fueron codificadas en forma de reglas generales. Sarraute, *Current Theory on the Moral Right of Authors and Artists under French Law*, 16 Am. J. Comp. L. 465–466; Merryman, *op. cit.*, supra, pág. 1026. Varios de los países que han adoptado el concepto de derecho moral han suscrito convenios internacionales que obligan a cada país firmante respecto a los derechos intelectuales vigentes en los respectivos países. El Convenio de Berna de 1886, por ejemplo, modificado en la conferencia de Berlín en 1908 por 15 países, subsiguientemente en Roma en 1932 y

---

(³) Véase Arthur Fisher, *Studies on Copyright* (1963), sobre el historial de la legislación federal vigente para el 1°. de marzo de 1902 relativa a los derechos del autor antes de la compilación de 1909, págs. 72–73.

luego en Bruselas en 1948. También, el Convenio Universal de Ginebra de 1952. Los requisitos para gozar de la protección de los convenios se remiten al derecho interno de cada Estado, el cual podrá exigir las formalidades que quiera a las obras publicadas en su territorio o a las obras de sus nacionales, dondequiera que sean publicadas. Véase Espín, *Manual de Derecho Civil Español*, Vol. II, 4ª ed. 1974, págs. 304, 313. Naturalmente, los países que no ofrecen protección al derecho intelectual de sus artistas no participan en los tratados internacionales.

Tres distintas posiciones han sido identificadas en torno a esta materia. En los Estados Unidos, la obligación recae sobre el artista para convenir sus derechos con el comprador, quedando subsistente el problema de que futuros adquirentes de las obras no quedarían obligados. La posición intermedia la representa la Convención de Berna y la ley de Alemania, la cual impone al comprador el peso para conseguir el consentimiento del artista si aquél desea modificar la obra. La tercera posición es la existente en Francia ([4]) (y en Italia que tiene una situación comparable) donde el peso recae sobre el comprador y protege al artista contra su propio asentimiento a menos que la modificación de la obra a la que el artista ha consentido sea una de tipo razonable. Merryman, *op. cit.*, supra, pág. 42.

El caso de autos plantea lo que se ha llamado el derecho a la "integridad" de la obra lo cual se reconoce en algunas jurisdicciones como parte inseparable del derecho moral del artista. Este derecho, según queda dicho, está protegido en Francia y en otros países, pero no en Puerto Rico, a menos que contractualmente el artista se hubiera protegido.

Las obras aquí en cuestión consisten de unos murales pintados en varias edificaciones de caseríos públicos de la Corporación de Renovación Urbana y Vivienda (C.R.U.V.). El

---

([4]) En Francia la disposición estatutaria es al efecto de que el derecho moral es "perpetuo, inalienable e imprescriptible".

pintor peticionario realizó las obras de pintura como maestro de arte contratado por la C.R.U.V., mediante el pago de un salario,[5] en varios de los edificios administrados por dicha agencia. Según lo estipulado por las partes el peticionario utilizó como ayudantes a cuatro jóvenes a quienes adiestró en sus creaciones de dibujos y pinturas y quienes fueron pagados por la C.R.U.V. Esta agencia proveyó todos los materiales requeridos, incluyendo pintura. El peticionario creó e ideó las figuras, formas y significados de las obras realizadas.

No habiéndose reservado el autor el derecho a intervenir en la restauración de las obras adquiridas por la C.R.U.V. cuando así lo requiriera el efecto del tiempo y de los elementos, el Estado puede realizar el trabajo de restauración mediante el uso de un artista de su selección.

La determinación de lo que constituye el derecho moral de un artista y la protección de dicho derecho es una función legislativa. La ley debe establecer los criterios de lo que constituye una obra de arte, así como de los atributos que debe tener un artista que ha de ser protegido. Las normas deben ser fijadas y precisadas luego de oír a personas entendidas en ese quehacer espiritual a quienes la Legislatura puede acudir para orientación y consejo. El Art. 7 de nuestro Código Civil (31 L.P.R.A. sec. 7) que nos autoriza a resolver conforme a equidad cuando no haya ley aplicable al caso, teniendo en cuenta la razón natural de acuerdo con los principios generales del derecho y los usos y costumbres aceptados y establecidos, no nos da base para dar cuerpo a los principios que en

---

[5] En la Ley de Derechos de Autor (*Copyright Act*) de los Estados Unidos se estatuye que el término "autor" incluye un patrono en los casos en que la obra se realice mediante arrendamiento de servicios. Esto es, la persona que participa en la creación es un empleado del que arrienda sus servicios, y por tanto, se rompe la relación entre el artista y la obra creada. Véanse 17 U.S.C.A. sec. 26; Monta, *The Concept of "Copyright" versus the "Droit D'Auteur"*, 32 So. Calif. L. Rev. 177, 178–79 (1959).

muchos países han sido instrumentados por legislación detallada.

Si yo fuera legislador favorecería instrumentar legislación para proteger ese derecho. En mi carácter de Juez entiendo que no es mi función legislar.

En este caso en particular no hay prueba relativa a algún mérito excepcional de las obras en cuestión que justifiquen la intervención de los tribunales para proteger propiedad que forme parte del patrimonio público, ni tampoco surge que se hayan demostrado usos y costumbres aceptados y establecidos con respecto a los derechos morales del artista.

En vista de lo expuesto confirmaría la sentencia dictada por el tribunal de instancia que declaró sin lugar la petición de interdicto del peticionario.

—o—

Opinión concurrente y disidente del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 20 de mayo de 1977

Para el cumplimiento cabal de la función adjudicativa de este Tribunal en grado apelativo, desde la Ley Judicial de principios de siglo, se contemplaron las siguientes raíces:

"[Se] parte de la base de que la primera fuente de derecho para el juez es la ley, que es preferente, que debe cumplirse estrictamente siempre y en primer caso. Después de la ley, y acompañándola y facilitando su recta interpretación, está la doctrina jurídica, constituída por el precedente legal de las resoluciones de los tribunales superiores que han nacido de anteriores debates judiciales y de la reflexión y experiencia de los jueces, o que procedan del estudio detenido o del trabajo científico de los hombres de saber, que han escrito públicamente sobre las cuestiones de derecho de más importancia en los diversos ramos de la ciencia jurídica y de sus procedimientos. *Y como pueden ocurrir muchos casos en el constante desarrollo y progreso de las mismas doctrinas jurídicas y en las relaciones de derecho entre los hombres, que son múltiples e ilimitadas y que presentan a*

*cada paso aspectos nuevos para el juzgador, se hace necesario darle a éste una norma cierta dentro de la cual pueda siempre resolver, con mano segura y con criterio levantado, aquellas cuestiones de derecho que no resulten expresamente definidas y comprendidas en la ley vigente ni en los precedentes legales.*

*Y esa norma segura es la equidad, con arreglo a la cual el juez, a falta de ley estricta, debe valerse de su recta e ilustrada razón y aplicar, mediante ella, los principios generales del derecho, es decir, aquellas reglas de justicia que no están consignadas en ley alguna y que, sin embargo, constituyen el espíritu fundamental de las leyes, no sólo dentro de los límites de una nación, sino que también pueblos cultos y civilizados.*

De esta manera, pues, las sentencias de la corte de apelación deben ser, o conformes a ley, o conformes a doctrina, o conformes a equidad y, por consiguiente, tienen que resultar, en todos los casos, conformes a justicia." I *Informe de la Comisión para Revisar y Compilar las Leyes de Puerto Rico*, 121–122 (1901). (Bastardillas nuestras.)

Con esta perspectiva presente, es menester primeramente ampliar y precisar ciertos hechos a los ya expuestos en la opinión del Tribunal. Del examen detenido de las fotografías en colores de los murales en controversia y las estipulaciones acordadas por las partes en primera instancia, es incontrovertible que el recurrente Ossorio, como maestro de pintura bajo contrato, creó con su talento las figuras, formas y significado de los murales. Concurrentemente, adiestró a cuatro jóvenes que le auxiliaron en la realización de su obra artística en las paredes exteriores de varios edificios de la C.R.U.V. Se observa además, que los murales fueron pintados sobre unas paredes que forman parte esencial de la estructura de los edificios; en consecuencia no cabe especular sobre su posible remoción. Más importante aún, por estar expuestos a las inclemencias del tiempo, estos murales en paredes exteriores se deterioran rápidamente y necesitan ser renovados periódicamente. En este sentido la situación es semejante a la pintura y mantenimiento que se le provee a cualquier edificación, estructura o residencia en Puerto Rico.

Analizadas con sentido crítico las autoridades y juris-
prudencia aludidas por el Tribunal, es sumamente frágil sos-
tener que la ley española sobre propiedad intelectual aproba-
da hace casi un siglo, en 10 de enero de 1879, sea aplicable
al Puerto Rico de hoy, máxime ante la derogación taxativa de
los Arts. 428 y 429 del Código Civil Español al adoptarse
éste en virtud de la revisión realizada del nuestro en 1902.

Sin embargo, bajo la premisa de que no existe un precepto
de ley claro y terminante que regule la materia, en virtud
del Art. 7 de nuestro Código Civil (31 L.P.R.A. sec. 7), pro-
cede en equidad que reconozcamos en principio y demos va-
lidez en nuestra jurisdicción, como primacía de factores idea-
les sobre los simplemente pecuniarios, y sujeto a ciertas li-
mitaciones, al derecho de propiedad intelectual en el arte
pictórico en sus dimensiones de autor e integridad de obra.

En síntesis: ¿qué comprende en teoría el derecho moral?

"[L]os derechos morales, personales o extrapatrimoniales
(que salvaguardan la paternidad de la obra y la . . . integridad).
Se concentra este último grupo de facultades en el llamado usual-
mente—con más o menos propiedad—derecho moral del autor,
que es, indudablemente, un derecho de la personalidad, ya que
atañe a un bien ideal inseparable de la persona. El derecho moral
de autor—expresa De Cupis—constituye un derecho privado que
tiene por objeto no la obra del ingenio, que es un bien de natura-
leza patrimonial, sino, más bien el bien personal de la paternidad
intelectual, modo de ser moral de la persona del propio autor."
Castán Tobeñas, *Derecho Civil Español, Común y Foral,* Tomo I,
Vol. 2, 365–366 (1963).

Y Puig Brutau expresa:

"Con la denominación de propiedad intelectual se designa el
conjunto de derechos que la ley reconoce al autor sobre las obras
que ha producido con su inteligencia, en especial los de que su
paternidad le sea reconocida y respetada, así como que se le per-
mita difundir la obra, autorizando o negando, en su caso, la
reproducción.

En realidad, sólo puede hablarse de propiedad en relación con
obras literarias, científicas o artísticas, en un sentido muy am-

plio. Basta tener en cuenta que no recae sobre una cosa corporal, no atribuye un derecho perpetuo, y no puede usarse, disfrutarse o reinvindicarse como si se tratara de la propiedad sobre un objeto material. Como veremos al tratar del objeto y contenido de este derecho, el interés protegido es la obra del pensamiento o de la actividad intelectual, incluso con independencia de las cosas que la exteriorizan y le dan forma material. Tener la propiedad del ejemplar de un libro no es tener la propiedad de la obra contenida en el libro. La obra impresa ha sido posible por la existencia previa de la creación del autor, a quien corresponde el derecho exclusivo de dejarlo publicar.

Es un derecho reconocido casi en todo el mundo, aunque su regulación puede variar dentro de límites bastantes amplios. Por un lado hay que reconocer el derecho del autor, que es un monopolio más o menos limitado; por otro lado, esta limitación trata de conseguir que el derecho del autor sea compatible con los intereses sociales a la divulgación de los conocimientos. El derecho está contrarrestado, en definitiva, por su carácter temporal." Tomo III, 2 *Fundamentos de Derecho Civil*, 201 (1973).

Ahora bien, la exaltación de lo bello y artístico no puede lograrse mediante ideales de justicia absoluta y abstracta, sacrificando la formulación del derecho concreto y el equilibrio que debe caracterizar toda decisión judicial fundada en "equidad". Manresa nos advierte de esta dificultad al consignar que el "regular el ejercicio del derecho de propiedad intelectual, entraña un principio justo, pero que es casi imposible de traducir concretamente, de un modo esencialmente jurídico, pues tiene que formularse en disposiciones circunstanciales de carácter empírico y convencional." 3 *Código Civil Español*, 631 (1934).

En el aspecto referente a la integridad de la obra bajo nuestra consideración y en las circunstancias particulares del caso, disiento de la *disposición final* que en la práctica le confiere al recurrente Ossorio, como pintor, un derecho absoluto casi eterno de propiedad intelectual, incompatible con los exponentes de la teoría ecléctica o intermedia adoptada por el Tribunal. La prerrogativa que le asiste de velar porque su

obra sea respetada debe conjugarse con el derecho de propiedad de la recurrida C.R.U.V. a mantener, conservar y restaurar su patrimonio permitiéndole contratar, con exclusión del recurrente si así lo estima pertinente, a otras personas idóneas, incluyendo los ex-discípulos que colaboraron en su realización.

Para esta tarea no es menester pedir autorización previa al autor, pues por la naturaleza, características y ubicación de la obra, el permiso implícitamente existe. Menos procede otorgarle un derecho preferente equivalente a vincular a la entidad recurrida perpetuamente con el artista, de manera onerosa, con el consabido gravamen y quebranto económico que de ello forzosamente surgirá. La doctrina francesa que dio fruto a la concepción del derecho moral reconoce, bajo ciertas condiciones, que es renunciable. Straus: *The Moral Right of the Author*, 4 Am. J. Comp. L., 515–516 (1955). "Aparentemente el poder de enajenar se extiende solamente al aspecto de la modificación y uso pero no incluye el derecho a la paternidad." Katz, *The Doctrine of Moral Right and American Copyright Law—A Proposal*, 24 So. Cal. L. Rev. 406–409 (1950–51).

De conformidad con lo expresado, fue correcta la conclusión de la ilustrada sala sentenciadora:

"La CRUV viene obligada al mantenimiento y conservación de sus edificios. La conservación incluye el embellecimiento como el que se hizo en el presente caso mediante la pintura de murales en el exterior de algunos edificios y la renovación y retoque de dichos murales. No vemos qué derecho le asiste al pintor para oponerse a la conservación de los mismos por otras personas o a exigir que sólo él sea el que pueda hacer el trabajo de restauración y retoque, no habiéndose pactado nada en ese sentido en el contrato de servicios."

El derecho de autor del recurrente Ossorio no significa una *exclusiva permanente* para instaurar sus obras, sino el defender la integridad de las mismas, oponiéndose a cualquier mutilación, deformación o modificación sustancial injustifi-

cadas, innecesarias e irrazonables de los murales, que le causaren comprobado perjuicio a su honor o reputación. Nos preguntamos: ¿Si por razones presupuestarias la C.R.U.V. no pudiera renovar y mantener los murales, podría el recurrente Ossorio acudir a los tribunales a obligarla? Respetuosamente entiendo que bajo la tesis jurídica sostenida por el Tribunal ello es posible y que la C.R.U.V. no podría siquiera optar por eliminarlos en circunstancias justificadas.

En consideración a lo expuesto y no habiéndose demostrado en el tribunal de primera instancia lesiones a la integridad de las obras, confirmaría la sentencia que declaró sin lugar la demanda interpuesta.